MINNESOTA MINING AND MANUFACTURING COMPANY (a/k/a 3M), Appellant,

v.

Danna ATTERBURY, Lynne Bliven Overbey, Sherry Bonds, and Patricia Stewart, Appellees.

No. 06–97–00099–CV.

Court of Appeals of Texas, Texarkana.

Submitted July 16, 1998.

Decided July 31, 1998.

Order Overruling Rehearing Sept. 9, 1998.

---

34. *Id.*

David S. Lill, Clark, Thomas, Winters, P.C., Austin, John R. Mercy, Atchley, Russell, Waldrop, Texarkana, Karen Bishop, Bishop & Bishop, P.C., Gilmer, Kenneth Tekell, Tekell, Book, Matthews, Limmer, Houston, David P. Herrick, Dallas, for appellant.

Kip A. Petroff, Dallas, Lonnie C. McGuire, Jr., Dallas, Todd Tefteller, Tefteller & Pelaia, Gilmer, for appellees.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

OPINION

ROSS, Justice.

This is an appeal from a judgment in favor of four plaintiffs in a products liability and negligence case involving silicone gel breast implants. Minnesota Mining and Manufacturing Company (3M), the defendant, appeals this judgment. We reverse and render judgment for 3M.

For a period of time in the late 1970's and 1980's, 3M manufactured silicone gel breast implants and distributed them to plastic surgeons. Specifically, McGhan was formed in 1973 to produce medical implants, and 3M bought McGhan in 1977. 3M's implants came with package inserts that warned, among other things, about capsular contracture and accompanying discomfort in the tissue around the implant, rupture, and leakage. The four plaintiffs had breast augmentations using 3M's implants between 1979 and 1984. Each plaintiff experienced a variety of diseases or symptoms which they attributed to the implants. They therefore had the implants removed between 1994 and 1995 and then sued 3M for negligence and products liability.

The case was tried to a jury. The plaintiffs called three experts to testify as to causation. Dr. Robert Herndon and Dr. Jeffrey Gross, neurologists, testified as to Danna Atterbury's medical conditions. Dr. Mitchell Forman, an osteopathic rheumatologist, testified as to all four plaintiffs. Further, the plaintiffs called Dr. Pierre Blais, a biomaterials expert, but he was not offered to testify about causation. The jury found that the breast implants had marketing, manufacturing, and design defects when they left the manufacturer, and found that those defects were the producing cause of the illness or injury to the plaintiffs. The jury also found that 3M was both negligent and grossly negligent and that such negligence was the proximate cause of the plaintiffs' illnesses or injuries. The jury awarded the following:

| Plaintiff | Compensatory Damages | Punitive Damages |
| --- | --- | --- |
| Danna Atterbury | $320,000 | $250,000 |
| Lynne Bliven Overbey | $ 75,000 | $250,000 |
| Sherry Bonds | $ 85,000 | $250,000 |
| Patricia Stewart | $ 75,000 | $250,000 |

The court rendered judgment on the verdict and awarded prejudgment interest, postjudgment interest, and court costs to each plaintiff. 3M filed motions for new trial and judgment notwithstanding the verdict, which the trial court denied. 3M now appeals the judgment and challenges it for two basic reasons: 1) the plaintiffs did not provide the trial court with sufficient reliable scientific evidence that could support a fact finder's determination that silicone breast implants caused any injury or illness in the plaintiffs; and 2) the plaintiffs did not provide the trial court with sufficient evidence to support an award of punitive damages. In response to 3M's appeal, the plaintiffs allege that 3M waived its argument as to the sufficiency of the evidence to support a finding of causation by failing to object to the jury question on the issue of "illness versus injury."

I. WAIVER

■ The first issue this Court must address is whether 3M waived its right to appeal the judgment based on sufficiency of the causation evidence due to its failure to object to the jury question on illness versus injury. The trial court posed both of the critical liability questions using the disjunctive "or" and asked the jury if the 3M implants had caused "illness or injury" to each of the plaintiffs. The plaintiffs argue that 3M only raised an issue on appeal with regard to illness and did not raise a point of error attacking the jury's finding that the implants caused injury to each of the plaintiffs. However, 3M's first issue states, "The theory that silicone gel breast implants cause human *illness or injury* is a novel scientific theory that has been rejected by every competent, peer-reviewed epidemiology study conducted to date ...." (emphasis added). Additionally, in a footnote, the appellant's first issue "raises both the legal and factual sufficiency of the evidence to support the causation elements in [the liability jury ques-

tion]." Further, 3M properly raised objections at trial in the form of motions to exclude the experts' testimony, requested and received a pretrial *Robinson/Havner* hearing, requested and received a running objection to the experts' testimony, cross-examined the experts, raised the issue during the charge conference, and filed a motion for judgment notwithstanding the verdict and a motion for new trial based on claims of insufficient evidence to support a causation finding. Whether the plaintiffs' complaints are called illnesses or injuries, to sustain the judgment under either theory the plaintiffs must prove causation. In *Maritime Overseas Corp. v. Ellis,* a recent Texas Supreme Court opinion, the court stated "[t]o preserve a complaint that scientific evidence is unreliable … a party must object to the evidence before trial or when the evidence is offered." 971 S.W.2d 402, 409 (Tex.1998). Thus, 3M's actions are sufficient to preserve this issue for review.

## II. GENERAL PRECEDENT ON EXPERT WITNESS TESTIMONY

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the United States Supreme Court considered the standard for admitting expert scientific testimony in a federal trial. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 408–09 (Tex.1998). The focus of *Daubert* was on the trial court's discretion to admit or exclude scientific evidence before or during a trial. *Maritime Overseas Corp. v. Ellis,* at 408–09. In *Daubert,* the plaintiffs were two minor children and their parents who sued Merrell Dow alleging that the children had birth defects that had been caused by their mothers' ingestion of Bendectin. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 582, 113 S.Ct. 2786. Merrell Dow moved for sum-

mary judgment, contending that Bendectin does not cause birth defects in humans. *Id.* The trial court granted the motion because the plaintiffs' evidence of causation was not based on principles that were sufficiently established in the field to which they belong, relying on what is otherwise known as the *Frye* test.[1] *Id.* at 583, 113 S.Ct. 2786. The district court concluded that, due to the vast body of epidemiological data concerning Bendectin, expert testimony which is not based on epidemiological evidence is not admissible to establish causation. *Id.* at 583–84, 113 S.Ct. 2786. The appellate court affirmed the district court's summary judgment, and the plaintiffs filed an application for writ of certiorari. *Id.* at 584–85, 113 S.Ct. 2786.

The United States Supreme Court vacated the summary judgment. *Id.* at 597–98, 113 S.Ct. 2786. The Court held that the lower court's reliance on the *Frye* test was error. *Id.* at 585–89, 113 S.Ct. 2786. The Court stated that the Federal Rules of Evidence supersede the *Frye* test and that Federal Rule of Evidence 702 controls the issue of admissibility of scientific evidence. *Id.* Rule 702 states, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED. R. EVID. 702. However, even though the *Frye* test is no longer a valid restraint on the admissibility of scientific evidence, Rule 702 does place some limits on the admissibility of purportedly scientific evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 589, 113 S.Ct. 2786. The Court read Rule 702 as requiring that the evidence be both reliable and relevant. As for the requirement of reliability, the Court stated:

---

1. The *Frye* test originated in 1923 when the then Court of Appeals for the District of Columbia stated:

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recog-

nized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 585–86, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (citing *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923)).

The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.

*Id.* at 589–90, 113 S.Ct. 2786 (citations omitted). The relevancy requirement simply demands that the evidence "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591, 113 S.Ct. 2786; *see also* FED. R. EVID. 702.

The Court stated that at the proffer of expert scientific evidence the trial court must determine at the outset whether the evidence is reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. at 592–93, 113 S.Ct. 2786. The Court offered a nonexhaustive list of factors that a court may consider in determining whether scientific evidence is reliable. *Id.* at 593, 113 S.Ct. 2786. This list of factors is as follows: 1) whether the theory or technique can be or has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error of the technique; and 4) the general acceptance in the scientific community. *Id.* at 593–94, 113 S.Ct. 2786. However, no one of these factors is dispositive. *Id.* The trial court's determination is a flexible one, and the focus must be only on the methodology that was used in reaching the conclusion and not on the conclusion itself. *Id.* at 595, 113 S.Ct. 2786.

In concluding, the Court addressed the defendant's concern that the abandonment of the *Frye* test would result in a "free-for-all" where "absurd and irrational pseudoscientific assertions" would confound and befuddle juries. The court answered this concern by stating:

In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Id.* at 596, 113 S.Ct. 2786. Thus, the Supreme Court began with the presumption that all relevant evidence is admissible unless excepted by the Constitution, a statute, or a rule, and that the standard of relevance is a liberal one. *Id.* at 585–89, 113 S.Ct. 2786; *see also Pick v. American Med. Sys., Inc.,* 958 F.Supp. 1151 (E.D.La.1997). The Court favored admission of evidence on the borderline because of the aforementioned "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof...." *See Pick v. American Med. Sys., Inc.,* 958 F.Supp. at 1155.

Despite years of relatively well-settled precedent in Texas in which no court has ever used the *Frye* test, the Texas Supreme Court adopted the *Daubert* approach to admitting scientific evidence in *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995). In *Robinson,* the plaintiffs sued the manufacturer of Benlate 50 DF for products liability and breach of warranty, and claimed damages under the DTPA for damages to their pecan orchard. The plaintiffs offered an expert to support the causation element of their claim who would testify that additives to Benlate contaminated and damaged the pecan trees. The court held that Texas Rule of Evidence 702 contains three requirements: 1) the witness must be qualified; 2) the proposed testimony must be scientific knowledge, i.e. reliable; and 3) the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue, i.e., relevant. *Id.* at 556.

In discussing the relevancy requirement, the court held that Rule 702 incorporates a traditional analysis under Texas Rules of Evidence 401 and 402 and that, to be relevant, the testimony must be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Id.* In discussing the reliability requirement, the court held that the underlying scientific technique or principle must be reliable. *Id.* at 557. In

making this determination, a trial court should look at several factors: 1) the extent to which the theory has been or can be tested; 2) the extent to which the technique relies upon the subjective interpretation of the expert; 3) whether the theory has been subjected to peer review and/or publication; 4) the technique's potential rate of error; 5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; 6) the nonjudicial uses which have been made of the theory or technique; and 7) any other factor which is helpful to determine the reliability of the scientific evidence. *Id.*

The court then additionally places the burden on the trial court to determine whether the probative value of the proffered expert's testimony is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. *Id.* This last burden is considerable because it requires a trial court to make a determination as to Rule 403 without a party making a timely and specific objection grounded on that rule. Further, the court lowers the burden from "substantially outweighed" to just "outweighed." *Compare id.* at 557 *and* Tex.R. Evid. 403.

The court states that Rule 702 "envisions a flexible inquiry focusing solely on the underlying principles and methodology, not on the conclusions they generate." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 557. The precise list of factors and the fact that the determination is an initial one by a trial court that does not depend on the credibility of a witness seems to suggest that the standard of review of the trial court's determination would be de novo. However, the court stressed that the standard of review is still that of abuse of discretion.[2] Further, the court clarified whose burden it is to

prove that the expert's testimony is reliable. *Id.* The court stated that once the party opposing the evidence objects, the proponent bears the burden of demonstrating its admissibility. *Id.* The court then addressed several of the factors and found that the trial court did not abuse its discretion in excluding the plaintiff's expert's testimony and in granting the defendant's motion for summary judgment.

The Texas Supreme Court differed from the United States Supreme Court in the confidence that it has in the ability of the adversarial system to present, and fair and impartial juries to consider, borderline evidence. As stated before, the United States Supreme Court favored admission of evidence on the borderline because the jury should be able to ascertain the truth through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof...." *See Pick v. American Med. Sys., Inc.*, 958 F.Supp. at 1155. However, the Texas Supreme Court apparently does not share this confidence in the adversarial system and the abilities of counsel. It stated that judges are better at evaluating scientific reliability because counsel often cannot cross-examine expert witnesses effectively "because it can be difficult to explain weaknesses in the [expert's] testimony to the jury and can even make things worse." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 558.

This Court applied *Robinson* in *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927 (Tex. App.—Texarkana 1997, writ denied). In *Purina Mills*, the plaintiff purchased some feed from the defendant and fed it to his dairy cows. *Id.* at 930–31. After some of the cows became ill with hardware disease, the plaintiff sued the defendant and claimed that the feed contained metal particles and caused his cows' illness. *Id.* The plaintiff offered two

---

**2.** It should be noted that in *Robinson* the trial court ruled that the evidence should be excluded and granted summary judgment for the defendant. The test for abuse of discretion was stated as:

> whether the trial court acted without reference to any guiding rules or principles. The test is not whether, "in the opinion of the reviewing court, the facts present an appropriate case for

the trial court's action." A reviewing court cannot conclude that a trial court abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court committed a mere error in judgment. The decision whether to admit evidence rests within the discretion of the trial court.

*E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 558 (citations omitted).

expert witnesses who testified that the feed caused the cows' illness based upon reasonable veterinary medical probability. *Id.* at 936–37. The jury awarded the plaintiff over $600,000 in damages, and the defendant appealed, claiming there was both legally and factually insufficient evidence to support the jury's finding of causation. *Id.* at 930–31.

This Court analyzed the various types of evidence that the plaintiffs offered to support the element of causation. The first type was expert testimony. We noted that the experts' testimony was not reliable because the experts did not conduct other tests to exclude other potential causes, their methodology was suspect because they did not take representative samples of the feed in determining whether the feed was contaminated with metal, their research and testimony was conducted solely for litigation, and there was no rate of error analysis done for any of the plaintiff's samples of feed or cattle. *Id.* at 934. After explaining how the experts' testimony could not be used to support the finding of causation, this Court noted that a lay opinion is adequate to prove causation where *general experience and common sense* enables a layman to determine with reasonable probability the causal relationship between the event and the condition. *Id.* at 939. Then this Court described the lay testimony that supported causation and held that there was some evidence of causation, in that some of the cattle did ingest metal from the feed and that had an adverse economic impact on the herd. *Id.* at 940. Thus, this Court could *not reverse and render judgment for the* defendants due to legal insufficiency because there was some evidence of causation. However, this Court noted that the conclusion that all of the herd was economically impacted was *not* factually supportable because there was factually insufficient evidence to prove that the entire herd consumed contaminated feed. *Id.* Thus, this Court reversed the judgment.

Once again the Texas Supreme Court addressed the requirements of Rule 702 as they apply to the admissibility of scientific testimony. The court addressed the legal sufficiency of scientific evidence to support the element of causation in *Merrell Dow Pharmaceuticals, Inc.* v. *Havner,* 953 S.W.2d 706 (Tex.1997). This case, like *Daubert,* involved a plaintiff who was born with birth defects and sued the manufacturer of Bendectin (which the plaintiff's mother ingested during pregnancy) for negligence, defective design, and defective marketing. *Id.* at 708. The court first held that if a trial court uses its discretion to admit scientific testimony, a party may raise the sufficiency of that evidence on appeal. *See id.* at 714.[3] The reviewing court uses the same criteria, the *Daubert/Robinson* factors, in judging whether the scientific testimony was reliable enough to legally support the jury's finding of causation. *See id.* The no evidence standard of "in the light most favorable to the verdict" is seemingly diminished by the court. A reviewing court must look beyond an expert's statement that his opinion is based on the type of data on which experts reasonably rely. *Id.* at 713. A reviewing court must independently evaluate the underlying data in determining if the opinion itself is reliable. *Id.* The court sets out several ways in which an expert's testimony would be unreliable and stated:

> If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable. Further, an expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious. Under that circumstance, the expert's scientific testimony is unreliable and, legally, no evidence.

*Id.* at 714.

The court then described in lengthy detail the causation theories that focus around Ben-

---

3. The court stated, "[a] flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious.... [U]nder that circumstance, the expert's scientific testimony is unreliable and, legally, no evidence." *Merrell Dow Pharmaceuticals, Inc.* v. *Havner,* 953 S.W.2d 706, 714 (Tex.1997).

dectin.[4] The court did give some guidance as to what a reviewing court should look to in assessing the sufficiency of scientific evidence. The court stated, "Sometimes, causation in toxic tort cases is discussed in terms of general and specific causation. General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* at 714 (citations omitted). Many plaintiffs attempt to prove general causation by the use of epidemiological studies.[5] However, plaintiffs cannot establish the specific cause of an individual's injury or condition by solely using epidemiological studies. *Id.* at 715. The court described the spectrum of cases in which some courts and advocates hold that an epidemiological study of something less than a doubling of the risk may alone support a jury's finding of causation, whereas the other end asserts that epidemiological studies evidencing more than double the risk cannot, standing alone, establish causation. *Id.* at 716.

The court held that scientifically *reliable* epidemiological studies[6] that suggest the risk of injury or condition is more than doubled is sufficient evidence of general causation to pass a legal sufficiency review. *Id.* at 718. However, the plaintiff must still introduce other credible evidence to support specific causation. *Id.* at 718. The court then addressed what a plaintiff would have to prove when using an epidemiological study to support a claim of specific causation. The court stated:

> To raise a fact issue on causation and thus to survive legal sufficiency review, a

claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies. This would include proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study. Further, if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty.

*Id.* at 720 (citation omitted). The court expressly refused to rule whether an epidemiological study with a less than double the risk assessment along with other reliable evidence would suffice to support causation, either general or specific. *Id.* at 719. However, the court did state that expert testimony that is not scientifically reliable cannot be used to shore up epidemiological studies that fail to indicate more than a doubling of the risk. *Id.* at 720.

The court then proceeded to evaluate the plaintiff's experts and concluded that there was not legally sufficient evidence to support the element of causation. During this analysis the court stated that where a plaintiff offers evidence of epidemiological studies, this may prove associations but not causation. *Id.* at 727. Further, the court noted, "it is important that any conclusions about causation be reached only after an associa-

**4.** Justice Spector, concurring, wrote, "I am uncomfortable with the majority's ambitious scientific analysis and its unnecessarily expansive application of the *Daubert* standard. The majority's opinion, replete with *dicta*, gives courts no practical guidance outside the context of Bendectin litigation." *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d at 732 (Spector, J., concurring). Despite Justice Spector's conclusion that *Havner* gives no practical guidance outside the context of Bendectin litigation, the majority does set out guidelines that this Court must follow.

**5.** Epidemiological studies examine existing populations to attempt to determine if there is an

association between a disease or condition and a factor suspected of causing that disease or condition. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d at 715.

**6.** The court later in the opinion writes that a scientifically reliable study has an error rate of no more than five percent. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d at 724. Further, the court stated that there are other factors that a reviewing court should consider in determining whether a study is scientifically reliable, such as, but not limited to: 1) sample size of the study; 2) power of the study; 3) confounding variables; and 4) whether there was selection bias. *Id.*

tion is observed in studies among different groups and that the association continues to hold when the effects of other variables are taken into account." *Id.* Additionally, the court stated that one epidemiological study would not prove that it is more probable than not that an association exists. *Id.* In other words, plaintiffs cannot rely on one epidemiological study. Further, animal studies, standing alone, cannot support a finding of causation. *Id.* at 729.

Under *Robinson* and *Havner,* a defendant has two bites at the *Daubert* apple. He can and should object to the proffer of the evidence at trial. If the trial court excludes the evidence, then the reviewing court views the trial court's decision by the lenient abuse of discretion standard. However, if the trial court overrules the defendant's objection and admits the evidence, then the defendant may seek review of the trial court's decision in a sufficiency of the evidence point of error to an appellate court. Further, under the sufficiency of the evidence standard, the appellate court looks to the plaintiff's evidence in an almost de novo standard because the "in the light most favorable to the judgment" standard appears to be all but eviscerated.

## III. PRECEDENT ON EXPERT WITNESS TESTIMONY IN SILICONE CASES

In reviewing the general case law on whether other plaintiffs have sustained a judgment based upon alleged silicone-induced illnesses or injuries, the cases are evenly split. Several cases have held that expert testimony is not reliable in the context of alleged silicone-induced injuries and illnesses.

In *Cabrera v. Cordis Corp.,* 134 F.3d 1418 (9th Cir.1998), the plaintiff had a silicone shunt in her brain and sued the manufacturer for various injuries which she attributed to the silicone. The trial court excluded the plaintiff's experts based on *Daubert* and granted the defendant's motion for summary judgment. *Id.* at 1419. The Ninth Circuit affirmed the trial court and analyzed each of the plaintiff's experts. With regard to one of the experts, the court found it important that the expert's opinion was based upon a blood test that he performed. However, the court noted that there is no generally accepted blood test for silicone antibodies and the expert's test had never been peer reviewed or even documented. *Id.* at 1422. Thus, the court found that the expert was properly excluded because he provided "no explanation of 'precisely how [he] went about reaching his conclusions' regarding the accuracy of his testing measure, and could not 'point to some objective source ... to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'" *Id.* With regard to a second of the plaintiff's experts, the court held that the trial court did not err in excluding him because the expert could not identify any peer-reviewed articles or research supporting his conclusion and because he did not explain precisely how he went about reaching his conclusions by pointing to some objective source to show that he had followed the scientific method. *Id.* at 1423. Therefore, the court affirmed the trial court's summary judgment and held that a purely subjective opinion of an expert will not be sufficient, but that there must be some objective source to verify that he used a reliable scientific method in reaching his opinion.

In *Kelley v. American Heyer–Schulte Corp.,* 957 F.Supp. 873, 875 (W.D.Tex.1997), the plaintiff received two of the defendant's implants in 1977. The plaintiff then sued the defendant, claiming that the implants caused her to develop Sjogren's Syndrome, an inflammatory disorder with the symptoms of dry eyes, dry mouth, and dry vagina. *Id.* The court held that the plaintiff must prove both general and specific causation, that the implants could cause the injury in someone, and that it did cause the injury in the plaintiff. *Id.* (citing *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 313 (5th Cir.), *modified,* 884 F.2d 166 (5th Cir.1989)).

The plaintiff offered the testimony of two experts on the issue of causation. The first was an epidemiologist who testified that breast implants could cause the plaintiff's illness in general. She based this opinion on two studies, the Hennekens study and the Giltay study. *Id.* at 877. The court held

that the Hennekens study was insufficient to support the expert's conclusion because the strength of the association is low, the consistency of the association is low, alternative explanations are likely, the association is not specific, and there is no dose-response relationship. *Id.* at 879. The court held that the Giltay study was even less reliable due to its small sample size of 445 and the other aforementioned factors. *Id.* at 880. Thus, the court excluded the plaintiff's first expert witness because her conclusions were not based on reliable data.

The plaintiff's second expert, a noted rheumatologist, testified as to both general and specific causation. However, he relied upon the same two studies as did the first expert. *Id.* at 881. Additionally, his own studies had not been published, were not generally accepted in the medical community, and had not been tested. *Id.* Thus, the court held that the second expert's testimony on general causation should be excluded. As for the second expert's testimony concerning specific causation, the court stated:

> While epidemiological evidence is not a necessary element in every toxic tort case, it is certainly a very important element, especially when there is no evidence of the biological mechanism which links the product to the complained-of condition. In the absence of any evidence regarding general causation, the court will not permit [the second expert] to testify as to specific causation.

*Id.* at 882 (citation omitted). The court went further and stated that, even if the expert could give testimony as to specific causation, in the absence of any evidence of general causation, the expert's testimony would not be sufficient. *Id.* at 883. The court stated that medical testimony on the issue of specific causation is sufficient if the expert bases his opinion on an examination (or a review of

the medical record), his experience, and a broad reading of the medical literature. *Id.* (citing *Carroll v. Morgan*, 17 F.3d 787, 789–90 (5th Cir.1994)). The court defined the "broad reading of the medical literature" element as requiring the expert to point to specific passages in varied and different sources that are generally accepted as support for his conclusion. *Id.* The second expert only pointed to several studies rather than to a broad literature review; thus, the court excluded his testimony on specific causation. *Id.* The court then excluded both of the plaintiff's experts and granted summary judgment for the defendant. *Id.* at 884.

Additionally, in *In re Breast Implant Litigation*, 11 F.Supp.2d 1217 (D. Colo.1998), the Colorado district court held that the plaintiffs' expert's testimony on the causal link between silicone gel implants and autoimmune or systemic disease should be excluded because it was not reliable.

Several courts have refused to directly rule on the issue of whether the silicone could in general cause systemic illnesses or injuries in people. In *Pick v. American Med. Sys., Inc.*, 958 F.Supp. at 1154, the plaintiff's husband had a silicone penile implant that was manufactured by the defendant. The plaintiff's husband acquired an autoimmune disease, which he attributed to the silicone in the implant, and sued the defendant, but died before trial. *Id.* at 1155. The defendant filed a motion for summary judgment, claiming that there was no genuine issue as to a material fact about causation, either general or specific. *Id.* at 1154. The court discussed the various types of evidence that were acceptable to prove general causation. The court concluded that although epidemiological evidence is the most useful and conclusive type of evidence, it was not a necessary element of every toxic tort case. *Id.* at 1158.[7] The court noted that the epidemiolog-

---

7. The court stated:
 As long as the basic methodology employed to reach such conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a statistically significant number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical.

*Pick v. American Med. Sys., Inc.*, 958 F.Supp. 1151, 1158 (E.D.La.1997) (quoting *Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1535–36 (D.C.Cir.1984)); *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir.1986); *Bowers v. Northern Telecom, Inc.*, 905 F.Supp. 1004, 1010 (N.D.Fla.1995)).

ical evidence that has been done to date is inconclusive on the issue of whether silicone causes any disease; however, the court does state that the Hennekens study is some evidence of a connection, even if slight and debatable, and would be admissible if offered. *Id.* at 1159–60. When confronted with the argument that the Hennekens study only has a 1.24 relative risk and at least a 2.0 is needed, the court stated, "Evidence is admissible, however, if it has 'any tendency' to prove or disprove a fact of consequence in the case. A relative risk above 1.0 is statistically significant, even if not sufficient, by itself, to establish causation by a preponderance of the evidence." *Id.* at 1160 (citations omitted).

The court next offers other types of evidence that can be introduced to prove general causation. The court states that case studies [8] employ valid scientific methodology and, due to the fact that they often appear in medical journals, they are well accepted in the scientific community as valid methodology. *Id.* at 1161. However, the court notes that case studies are susceptible to errors due to their small populations, the subjective nature of study with regard to the patient and physician, and finally, the possible bias due to litigation. *Id.* The court decided that the case studies in *Pick* were admissible, if offered. The court next notes that differential diagnosis [9] can be admissible to prove general causation. The court stated, "the physician should consider the history of the patient's symptoms, review his outside records, conduct a physical examination and laboratory testing, then evaluate all the possible causes of the condition, based on his medical training and available information, ultimately selecting a diagnosis which best fits all the findings." *Id.* at 1163. The court concludes the analysis of whether the plaintiff has created a fact issue with regard to general causation by stating that the matter is still unclear. However, because the court granted the defendant's motion for summary judg-

ment based on specific causation, the court did not decide the general causation issue. *Id.* at 1163–64.

The court then analyzed each of the plaintiff's witnesses and concluded that they were either unqualified to give a conclusion as to causation, or the qualified experts based their conclusions on unreliable methodologies. Thus, the court granted the defendant's motion for summary judgment on silicone-based illnesses or injuries due to the lack of specific causation evidence. *Id.* at 1173.

In *In re Breast Implant Cases*, 942 F.Supp. 958, 959 (S.D.N.Y.1996), the plaintiffs sued the defendants, claiming that they received permanent injuries resulting from exposure to silicone by way of implants. The defendants filed a motion for summary judgment based on the fact that there was no evidence of causation. The court stated:

> The deficiency of available proof would normally require a grant of summary judgment to defendants as to all but local symptoms. The national Rule 706 committee has, however, not yet reported. It is possible that further information will in time support plaintiffs' general systemic claims sufficiently to permit a jury trial. A grant of summary judgment and dismissal of plaintiffs' cases now would be unfair since scientists are still developing relevant information.

*Id.* at 961. The court then denied the summary judgments but allowed leave to renew the motions. *Id.*

In *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387 (D.Or.1996), the plaintiffs received breast implants manufactured by the defendant. The court held that the plaintiff's expert testimony was inadmissible because it was not based on reliable methodologies; however, it deferred its decision pending reports of the national scientific panel appointed by the judicial panel for multi-district litigation.

---

**8.** The court defined case studies as a study that assesses "general causation by the accumulation of individual cases showing the same connective pattern between a particular cause and effect." *Pick v. American Med. Sys., Inc.,* 958 F.Supp. at 1160.

**9.** The court defined differential diagnosis as a "patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes." *Pick v. American Med. Sys., Inc.,* 958 F.Supp. at 1162–63.

There are three cases that have supported the admission of expert testimony on the issue of causation in breast implant cases. In *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1118 (9th Cir.1994), the plaintiff sued the defendant for injuries she attributed to two sets of breast implants that she received from the defendant. The case went to trial, and the jury awarded the plaintiff over seven million dollars in actual and punitive damages. The defendant appealed the verdict, claiming that there was insufficient reliable evidence of causation. In affirming the judgment, the Ninth Circuit noted that the plaintiff's "experts based their opinions on the types of scientific data and utilized the types of scientific techniques relied upon by medical experts in making determinations regarding toxic causation where there is no solid body of epidemiological data to review." *Id.* at 1124. The court stressed that the plaintiff's experts who testified based their conclusions on reasoning or methodology that is scientifically valid, in that they based their opinions on their experience, their review of medical literature, their review of medical records and studies, their general scientific knowledge of silicone's effects as established by animal studies and biophysical data, and on preliminary epidemiological evidence. *Id.* at 1124–25. However, the court did not say whether the experts actually cited the medical literature on which they based their opinions or the specifics of the preliminary epidemiological study other than that the study has a population of 200. *Id.* Possibly based on the "viewed in the light most favorable to the verdict" standard, the court does not go into an endless recitation of the literature and studies that the experts reviewed, their experience, or the specifics of the epidemiological study. Thus, the court seemingly gave more deference to the expert's statements about how they reached their opinions than is allowed under *Robinson* and *Havner*.

In *Jennings v. Baxter Healthcare Corp.*, 152 Or.App. 421, 954 P.2d 829 (1998), the plaintiff received breast implants manufactured by the defendant. The defendant successfully had one of the plaintiff's experts excluded, and the case went to trial. *Id.* The jury found in favor of the defendant, and the plaintiff appealed the trial court's ruling excluding one of her expert witnesses. *Id.* The court of appeals reversed the trial court, stating that the court erred in excluding the plaintiff's expert. The court first cited the Oregon rules of evidence and the factors that go into determining whether an expert's opinion is reliable.[10] *Id.* at 833. These factors are similar to those followed in Texas and the federal system. In determining that the trial court erred, the court stated:

> We conclude that the trial court erred when it excluded Grimm's testimony about causation. Grimm's qualifications to determine the cause of the neurological deficits in patients in general is not questioned by Baxter. Although Grimm's hypothesis (the exposure of human tissue to silicone produces neurological injuries) appears to be novel, it is based on his own experiences and observations as well as on scientific methodology. The hypothesis was tested by Grimm's evaluation of 50 patients who exhibited unique symptoms and conditions similar to plaintiff's and who all had been exposed to silicone from breast implants. He conducted those evaluations by using neurological examination techniques generally accepted by the medical field and with an error rate of five to seven percent. He eliminated other potential causes through differential diagnoses, another generally accepted form of scientific methodology used in medical treatment. He also considered the research of others on animals. Based on an evaluation of all of the empirical evidence, he drew a conclusion from the data that is logically relevant.

*Id.* at 834. Thus, the court reversed and remanded the judgment.

In *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 696 N.E.2d 909 (1998), the plain-

---

10. The court stated, "a trial court must consider the following non-exclusive factors: 1) The technique's general acceptance in the field; 2) The expert's qualifications and stature; 3) The use which has been made of the technique; 4) The potential rate of error; 5) The existence of spe- cialized literature; 6) The novelty of the invention; and 7) The extent to which the technique relies on the subjective interpretation of the expert." *Jennings v. Baxter Healthcare Corp.*, 152 Or.App. 421, 954 P.2d 829, 833 (1998).

tiff had the defendant's silicone breast implants implanted in 1977. *Id.* 696 N.E.2d at 912. In 1993, she suspected that one of them had ruptured, which was confirmed when she had them both removed. *Id.* She sued the defendant on the bases of negligence and breach of warranty. The defendant filed pretrial motions to exclude the plaintiff's experts on various grounds. *Id.* at 912–13. However, at a hearing on those motions the parties narrowed their arguments to whether classical epidemiological evidence is a necessary predicate to support the opinions of the plaintiff's experts. *Id.* The trial court overruled the defendant's objections and admitted the plaintiff's experts' testimony. *Id.* at 913. The jury awarded a verdict for the plaintiff, and the defendant appealed. *Id.* at 909.

The appellate court only addressed the defendant's argument that classical epidemiological evidence is necessary and held that all of the defendant's other arguments were waived. *Id.* at 913. The court held that the trial court properly admitted the plaintiff's experts, stating:

> The judge properly concluded that the causation opinions of [the plaintiff's experts] could be admitted in the absence of classical epidemiological studies. Both witnesses possessed the knowledge, skill, and experience to qualify as experts in their fields, having conducted research, published in peer reviewed journals on silicone related topics, and treated hundreds of women with silicone gel breast implants in their clinical practices.... [One expert] described the bases for his opinion that silicone gel breast implants cause disease in women as including animal studies and controlled, blinded, clinical studies showing stimulation of the immune system by silicone; animal studies showing migration of the silicone; clinical studies showing local complications of silicone, including chronic inflammation; and the differential diagnosis method of identifying a patient's symptoms as being among those associated with silicone gel breast implants and eliminating any other causes for these symptoms.

*Id.* at 917. The court held that the trial court did not err in admitting the plaintiff's experts

as to causation in the absence of supporting epidemiological data. However, the issue was a narrow one, and the appellate court did not go through any *Daubert* analysis of the reliability of the plaintiff's experts' testimony. *Id.* at 913.

This survey of precedent only goes to prove that the judiciary is splintered on the impact of *Daubert* in the context of alleged silicone-induced illnesses or injuries. However, out of this body of cases, some are more persuasive than others because, in general, they use the same language and cite to the same authorities as does the Texas Supreme Court. Specifically, the San Antonio federal district court's language in *Kelley v. American Heyer–Schulte Corp.*, 957 F.Supp. 873, 875 (W.D.Tex.1997), is very similar to that of the Texas Supreme Court's, and we consider it as the most authoritative case on breast implant causation. Additionally, we note, as did the court in *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387 and *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 696 N.E.2d 909 that a national panel of experts has been appointed pursuant to FED. R.EVID. 706 to try to arrive at a consensus concerning the admissibility of expert testimony in silicone gel breast implant cases. The report of this panel may resolve the controversy surrounding claims of atypical connective tissue disease related to silicone breast implants.

## IV. ANALYSIS OF WHETHER PLAINTIFFS' EXPERT WITNESSES' TESTIMONY IS SUFFICIENT

Under this broad backdrop, this Court must now attempt to analyze 3M's contentions with regard to the sufficiency of the plaintiffs' evidence to support the jury's verdict on causation. We open our analysis by quoting the Ninth Circuit's introductory remark in *Daubert*, after having that case remanded to them from the Supreme Court:

> Our responsibility, then, unless we badly misread the Supreme Court's opinion, is to resolve disputes among respected, well-credentialed scientists about matters squarely within their expertise, in areas where there is no scientific consensus as to what is and what is not "good science," and

occasionally to reject such expert testimony because it was not "derived by the scientific method." Mindful of our position in the hierarchy of the federal judiciary, we take a deep breath and proceed with this heady task.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995).

Danna Atterbury alleges that 3M's silicone gel breast implants caused her to suffer: headaches, localized breast problems, rashes, loss of memory, fatigue, body aches, gastrointestinal complaints, problems with hand sensation, dry eyes and mouth, multiple sclerosis, and dystonia (torticollis). Lynne Bliven Overbey alleges that the implants caused her to suffer: acne, abdominal pain, bloating, irritable bowel syndrome, local breast pain, headache, swollen lymph nodes, numbness, tingling or burning sensation, joint and body aches, a skin pigmentation problem, low energy level, and memory loss. Sherry Bonds alleges that the implants caused her to suffer: headaches, acne, rashes, diarrhea, Raynaud's syndrome (a three-color change in the appearance of extremities), breast discomfort, memory loss, low white blood count, and Hashimoto's thyroiditis. Patricia Stewart alleges that the implants caused her to suffer: headaches, swollen fingers, tender breasts, bladder inflammation, skin lesions, joint pain, diarrhea, sleep disturbance, memory loss, lack of concentration, dry eyes, flu-like syndrome, and a low energy level. The plaintiffs offered three experts to prove that the silicone gel breast implants, based upon reasonable medical probability, more likely than not caused these injuries and illnesses.

 There can be no recovery of damages by an injured party unless the harm was caused by the defendant's actions. *Purina Mills, Inc. v. Odell*, 948 S.W.2d at 935; *Wheaton Van Lines, Inc., v. Mason*, 925 S.W.2d 722, 728 (Tex.App.—Fort Worth 1996, writ denied). Negligence and breach of warranty require a showing of proximate cause, while products liability action only requires a showing of producing cause. *Purina Mills, Inc. v. Odell*, 948 S.W.2d at 935. The components of proximate cause are cause in fact and foreseeability. *Id.* Determining whether an act or omission was a proximate cause of damages is usually a fact issue; however, where the facts are conclusive, the determination may be an issue of law. *Id.* Producing cause differs from proximate cause. Producing cause is an efficient, exciting, or contributing cause that, in a natural sequence, produces the injuries or damages complained of and, but for which, such injuries or damages would not have occurred. *Id.* at 935–36. Even though producing cause does not require foreseeability, both proximate cause and producing cause require cause in fact. *Id.* at 936. Cause in fact requires that the defendant's conduct be a substantial factor in bringing about the plaintiff's damages. *Id.* To sustain the ultimate finding of causation in fact, the plaintiffs must establish by a reasonable medical probability that each of them has suffered or will suffer injuries or illnesses as a result of the silicone gel breast implants manufactured by 3M. *See id.*

 As stated before, for an expert's testimony to be admissible and constitute some evidence, the expert must be qualified and his testimony must be relevant and reliable. 3M does not argue that the plaintiffs' three experts are not qualified or that their testimony is not relevant; the issue for this Court to decide is whether the plaintiffs' evidence is scientifically reliable and is some evidence to support the judgment in their favor. In determining whether there is no evidence to support a jury's finding, an appellate court should consider all the record evidence in the light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference is to be indulged in that party's favor. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d at 711. However, in determining whether an expert's testimony is scientifically reliable, an appellate court must necessarily look beyond any magic words and look at the numerous factors that have been developed in *Daubert, Robinson,* and *Havner. Id.* at 712. An expert's bald assurance of validity is not enough, standing alone, to meet a no evidence review. *Id.; E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 559. A no evidence point will be sustained when 1) there is a complete absence of evidence of a

vital fact; 2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; 3) the evidence offered to prove a vital fact is no more than a mere scintilla; or 4) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d at 711. More than a scintilla of evidence exists when the evidence in the record rises to a level that would enable reasonable people to differ in their conclusions. *Id.*

We will now discuss the types of evidence necessary in a legal and factual sufficiency of the evidence review to support a finding of causation in toxic tort cases. First, as the Texas Supreme Court has stated:

> [C]ourts must make a determination of reliability from all the evidence. Courts should allow a party, plaintiff, or defendant, to present the best available evidence, assuming it passes muster under *Robinson,* and only then should a court determine from a totality of the evidence, considering all factors affecting the reliability of particular studies, whether there is legally sufficient evidence to support a judgment.

*Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d at 720. Despite 3M's allegations of set rules, the court refused to set any strict rules regarding what types of evidence would be sufficient or not sufficient to support a finding of causation. There is no requirement in a toxic tort case that a party must have reliable epidemiological evidence of a relative risk of 2.0 or greater. Reliable epidemiological evidence with a relative risk lower than 2.0 should be considered because, as the court in *Pick* pointed out, it is relevant

evidence. However, the Texas Supreme Court has stated that an epidemiological study with a relative risk of less than 2.0 must be supported by other credible, reliable evidence, and a physician who has examined the plaintiff and seen a skewed data sample, i.e., case studies, is not in a position to infer causation. *Id.* at 719–20. Additionally, just because a party does have epidemiological evidence with a relative risk of 2.0 or greater does not automatically mean that he or she passes a sufficiency review under specific causation. *Id.* at 718. The plaintiff must still produce evidence that links him or her to the population in the study and produce other evidence that eliminates other possible causes of that particular plaintiff's illnesses or injuries.

Importantly, the reviewing court must determine whether the epidemiological evidence is indeed reliable before it can be used to support an expert's opinion. *Id.* at 725. This means that the expert must identify the study, get it admitted into evidence, and explain how the methodology of the study is scientifically reliable. *See generally id.* An error in any of the preceding steps will likely result in the study not being considered by a reviewing court. The Texas Supreme Court has also held that one reliable epidemiological study that has a statistically significant association will not be enough to satisfy a legal insufficiency review. *Id.* at 727. There must be some verification of the results by way of another study. *Id.*[11] Finally, when it comes to epidemiological evidence, the Texas Supreme Court places the *Daubert/Robinson/Havner* factor of peer-reviewed publication at a higher level than does the United States Supreme Court.[12] *See id.* at 726–27.

11. The court acknowledges the argument that waiting until an association found in one study is confirmed by others will mean that early claimants will be denied a recovery. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d at 727. However, the court dismisses this argument by stating, "history also tells us that valid and reliable research and theories are generally accepted quickly within the scientific community when sufficient explanation is provided and empirical data are adequate." *Id.* at 728.

12. The court stated:

> We do not hold that publication is a prerequisite for scientific reliability in every case, but courts must be "especially skeptical" of scientific evidence that has not been published or subjected to peer review. Publication and peer review allow an opportunity for the relevant scientific community to comment on findings and conclusions and to attempt to replicate the reported results using different populations and different study designs.

*Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d at 727.

If a plaintiff does not have reliable epidemiological evidence, what evidence can he or she offer to support a finding of causation? This is a good question. The Texas Supreme Court did not give any guidance as to what a plaintiff could offer that would be sufficient, but they did give guidance as to what type of evidence would not be sufficient. Abstracts that reanalyze other epidemiological evidence and that do not state the methodologies used, specifically the significance level, the confidence level, and the choice of the control group, will not be considered. *Id.* at 726. The court stated that *in vivo* animal studies that have questionable dosage levels may not be considered. *Id.* at 729. Further, *in vitro* animal studies may not be considered where the expert does not explain how he based his conclusions on humans from the animal study. *Id.* at 730. The court seems unimpressed with animal studies altogether; thus, it would be fair to say that animal studies, standing alone, are not likely to support a finding of causation.

There are other types of evidence that the Texas Supreme Court has not directly addressed but has discussed. With regard to case studies and clinical experience, the court stated:

> "The FDA has promulgated regulations that detail the requirements for clinical investigations of the safety and effectiveness of drugs. These regulations state that "[i]solated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered." Courts should likewise reject such evidence because it is not scientifically reliable."

*Id.* at 720 (citations omitted). Thus, an expert's prior unpublished and undocumented "experience" will not be enough to support causation. Additionally, even published, peer-reviewed case reports will not be enough to support causation unless the reports could be considered unisolated and detail their methodology so that there can be further scientific evaluation of them.

Another form of scientific evidence is known as differential diagnosis. This involves a history of the patient and a physical examination, and refers to the process a physician would undertake to eliminate other generally known causes of illnesses and injuries to diagnose a specific cause of a particular patient's illness or injury. The Texas Supreme Court has stated, "an expert's assertion that a physical examination confirmed causation should not be accepted at face value." *Id.* at 720. Clearly, an expert's recitation that he has examined a patient and has done a history of the patient and has concluded that X caused the patient to suffer with Y would not be sufficient to support causation. If the physician explained the exact methodology that he used in arriving at the conclusion, including discussing the exact other causes that have been ruled out and the generally accepted literature that he relied upon in making that conclusion, the differential diagnosis evidence could be sufficient to prove specific causation. Even though some courts have held that differential diagnosis is a valid form of evidence to support general causation, it most likely is not sufficient under current standards promulgated by the Texas Supreme Court. This statement is made based upon what appears to be the court's total reliance on objective evidence and its disdain for any form of subjective analysis.

It could be argued, as the plaintiffs have, that the guidelines set out in *Havner* only apply to cases where there is a full body of scientific evidence to evaluate. Further, in new areas of science, where there is not a complete body of epidemiological evidence, the standards should be more liberal. However, the Texas Supreme Court has stated, "Our legal system requires that claimants prove their cases by a preponderance of the evidence. In keeping with this sound proposition at the heart of our jurisprudence, the law should not be hasty to impose liability when scientifically reliable evidence is unavailable." *Id.* at 728.

As stated before, the factors to which a reviewing court should look in determining the reliability of scientific testimony are: 1) the extent to which the theory has been or can be tested; 2) the extent to which the technique relies upon the subjective interpretation of the expert; 3) whether the theory has been subjected to peer review

and/or publication; 4) the technique's potential rate of error; 5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; 6) the nonjudicial uses which have been made of the theory or technique; and 7) any other factor which is helpful to determine the reliability of the scientific evidence. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d at 714 (citing *Robinson,* 923 S.W.2d at 557).

In the instant case, the only evidence of causation introduced at trial was as follows. Dr. Robert Herndon testified as to the cause of Danna Atterbury's alleged injuries and illnesses. Dr. Herndon has only testified in one prior breast implant case. He testified that his first contact with this case was to review Atterbury's medical records and do a neurological history and examination. From this examination, Herndon testified that Atterbury had an atypical multiple sclerosis (MS)-like syndrome, which is an autoimmune disease. Herndon testified that this syndrome was more likely than not caused by the silicone gel breast implants. He based this conclusion on many factors, which we will address in turn.

First, Herndon relied on the fact that Atterbury did not have any incidents of MS before the implants were in her body and that the MS syndrome got better after the implants were removed. This is some evidence of specific causation. If it is proven that breast implants can cause MS, then this evidence would be relevant to support the finding that Atterbury's MS was caused by breast implants. However, it is no evidence of general causation, in that it is an "isolated case" and a "random experience." *See Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d at 720.

Second, even though there has not been much literature published about the relationship between silicone gel breast implants and MS, Herndon relied on an abstract that shows a significant increase in the rate of MS in those with silicone gel breast implants. This abstract is known as the Gross abstract, and it was displayed at a medical conference. It has never been published, nor has it undergone the traditional peer review that a published article would undergo. Further, Herndon admitted that the population the study chose was from the north, where incidents of MS are more common. Most importantly, Herndon was not aware of the scientific methodology that went into the Gross abstract, nor did he testify as to its appropriate rate of error. Even if the study is reliable, where an expert does not know the methodology behind the study, the rate of error, or the effects of population variation, his reliance on that study cannot support his ultimate conclusion. Therefore, the Gross abstract cannot support Herndon's conclusion that 3M's implants caused Atterbury's MS.

Third, Herndon studied two epidemiological studies that found that women with silicone gel breast implants have a higher incidence of anti-gangliocyte and anti-nuclear antibodies, which are highly associated with autoimmune disease. However, Herndon does not testify as to the methodologies that went into these studies or their rates of error. For a reviewing court to rule on the scientific reliability of a study that an expert cites as supporting his opinion, the study's methodologies and rates of error must be fully explained. *See id.* at 724. In the absence of such information, these studies cannot be considered in supporting the expert's opinion.

Fourth, Herndon based his opinion on his personal experience with former patients. As stated before, this is no evidence of causation because *Havner* would classify this as "random experience" that is not scientifically reliable. *Id.* at 720.

Fifth, Herndon testified that he reviewed animal studies, but did not name any of them or their results. Even if he had named the studies and given all the appropriate information about them, i.e., dosage levels, this information could not, standing alone, support his opinion concerning causation. However, Herndon did not even name the studies. The Texas Supreme Court has stated that a reviewing court must look beyond an expert's bald assurances, and this Court cannot do this required task if an expert does not cite to and explain precisely the studies that he relies upon. Thus, the mere statement that

he reviewed animal studies is no evidence of general or specific causation.

Sixth, Herndon based his opinion on his considerable education and experience in the field of neurology. This evidence goes to whether Herndon was qualified to give an opinion, not on whether his opinion is reliable. Thus, it is no evidence of general or specific causation.

Since Herndon did not have any reliable evidence to support his opinion that silicone gel breast implants caused Atterbury's MS, his testimony cannot be considered by this Court in determining whether there is sufficient evidence to support the jury's finding of causation.

Additionally, even though Herndon's theory is logical, all of the *Daubert/Robinson/Havner* factors lead to the conclusion that his testimony is legally insufficient to support the jury's finding. First, Herndon's theory has not been tested and could not easily be tested. Second, Herndon's theory is subjective, in that there is no reliable, objective evidence to support it. Third, Herndon testified that he has been looking at the relationship between MS and silicone breast implants since 1991 but has never published any article that expressed his view, either peer reviewed or not. Fourth, Herndon did not give any rate of error concerning his theory, but did admit that genetics does have an effect on the likelihood of a person developing MS, and that he was not able to review any of Atterbury's family history because she was adopted. Fifth, Herndon admitted that his theory has not been generally accepted by the scientific community. Sixth, Herndon gave no testimony as to any nonjudicial use made of his theory. Therefore, Herndon's opinion is no evidence of causation. Further, there was no evidence in the way of epidemiological studies or other studies introduced by Herndon that could support the jury's finding of causation.

█ Dr. Jeffrey Gross testified as to the causation of Danna Atterbury's injuries and illnesses. Gross testified that he had never before testified in a breast implant case. He also stated that he reviewed Atterbury's medical records and discussed them with her, as well as examining her. He agreed with the other experts who concluded that Atterbury has MS and a connective tissue disease. Gross agrees that, more likely than not, the breast implants caused Atterbury's MS and torticollis. He gave several reasons as the bases of his opinion.

First, he cited a study that he conducted. At the time of trial, there were only two studies that researched whether there was a higher rate of MS in people with breast implants. He coauthored an abstract on the rate of MS in patients with silicone gel breast implants. This abstract was presented at a meeting of the American Rheumatological Society. The abstract was posted on a posterboard and presented in the front hall of the place of the meeting so that Gross' peers could walk by and talk to the authors about the abstract and their findings. It is a method of getting interest in a topic so that further research can be done. In this study, he examined 156 women with breast implants and diagnosed seven of them with definite MS and eleven with probable MS, following accepted methods of diagnosing MS and making these determinations. He compared this with the normal rate of people with MS, which is 30 to 70 per 100,000 people in the United States, and concluded that there was a significant increase of MS in this admittedly unstructured study. There was a second study done by a Doctor Rosenberg. Although Rosenberg concluded that there is no relationship between MS and breast implants, his study found four women had MS out of 131 women he examined who had breast implants. Gross admitted that these studies are not formal epidemiological studies and only stand for the proposition that further research should be done. These two studies are legally insufficient to support a finding of causation because they are admittedly not epidemiological studies, Gross did not testify as to a rate of error, effect of population bias, or have the study peer reviewed in a formal sense. *See id.* at 724–29.

Second, Gross noted that Atterbury had a clean bill of health before the implants; after the implants, she had outbreaks of MS that got progressively worse. Gross further testified that after the implants were removed, Atterbury's MS got better. Gross testified

that a placebo effect was possible, but he did not attribute the lessening of Atterbury's symptoms to a placebo effect. Gross stated that the lessening of Atterbury's symptoms after the implants were removed is evidence that the implants caused her MS and that this proposition is supported by everyday medicine. Further, he ruled out that the MS was caused by cervical spondylosis, arthritis, or a pinch in her spinal cord due to a herniated disk. As stated before, this would be evidence to support specific causation, but is no evidence to support general causation. Thus, Dr. Gross' opinion as to the cause of Atterbury's illnesses or injuries is legally insufficient to support the jury's findings.

■■■ Dr. Mitchell Forman was the last of the plaintiffs' experts to testify as to causation. He testified as to all four plaintiffs and was the only expert who testified for Overbey, Bonds, and Stewart. He personally examined all four plaintiffs and concluded that, based upon reasonable medical probability, most of their injuries, illnesses, and symptoms were, more likely than not, caused by the silicone gel breast implants. He testified that in reaching this conclusion, he followed methodologies that are basically accepted and agreed upon by the medical community. These methodologies were history and examination. However, Forman admitted that there was no agreed criteria that he followed in making the diagnoses. Further, he testified that he based his opinions on literature that he had read on the topic, on conversations that he had with other physicians, on numerous case reports, and on his own experiences with more than 600 breast implant patients. When viewed by the *Daubert/Robinson/Havner* factors as used by the Texas Supreme Court, Forman's opinions are unreliable. First, Forman offered no testing that had been done to validate his opinions. When asked to explain his own methodologies and techniques, he stated that he could not. Thus, it would be very difficult to duplicate and test his opinions in the future. Second, Forman's opinion is entirely subjective. He did not provide the jury any objective evidence that proved any correlation between silicone breast implants and the various injuries and illnesses that he attributed to them. Third, because his opinion was entirely sub-

jective, Forman could not provide any rate of error in his opinion or technique. However, he did admit that he could be wrong and that the area of diagnosing silicone-related illnesses or injuries is extremely controversial and stated that he cannot say why some women suffer and others do not. Fourth, Forman's theory has not been published or subjected to peer review of any sort. Fifth, Forman's theory is not widely accepted in the scientific community, and he admits that the area is extremely controversial. Sixth, Forman gave no evidence that his theory has nonlitigation uses. Seventh, Forman admitted in cross-examination that he testified in a deposition given before trial that he did not know what caused many of the injuries, illnesses, and symptoms that he credited in his trial testimony to the implants.

Therefore, Forman's conclusions are not reliable as defined by the Texas Supreme Court. Forman only offered unreliable specific causation evidence. Although his methodology is widely accepted in the medical community in general, with regard to breast implants there is no generally accepted criteria by which doctors can link injuries and illnesses to implants. When his testimony is read in total, it is wholly devoid of any objective criteria by which a jury could reasonably conclude that breast implants caused any of the plaintiffs' injuries or illnesses in general. *See Cabrera v. Cordis Corp.*, 134 F.3d at 1423. Foreman relies upon subjective evidence such as uncontrolled case studies, unnamed articles and literature, nonspecific past experience, and differential diagnosis. These vague bases for Forman's opinion are not sufficient according to the Texas Supreme Court to support a jury finding of causation.

The plaintiffs attempt, in their brief, to use one of their experts, Pierre Blais, Ph.D., to establish causation. However, Blais was not designated to testify concerning causation and was not offered at trial to do so. Additionally, plaintiffs attempt to attribute the damage award to injuries that they sustained around their breasts, such as disfigurement and localized pain. However, the jury was instructed as follows:

Do not include any amount for any condition which was known by Plaintiff's plastic surgeon to be a potential complication associated with silicone breast implants. Do not include any amount for any condition resulting from the failure, if any, of Plaintiff's plastic surgeon to warn Plaintiff of potential illness or injury, if any, associated with silicone breast implants if such potential illness or injury, if any, was known to the plastic surgeon. The plastic surgeon is the person best qualified to make a careful, balanced assessment of the risk and benefits from the breast implant's use.

Thus, many of the plaintiffs' complaints were not compensable. Further, those localized complaints of disfigurement and deformity were either not submitted to the jury or the jury found against the plaintiffs on those damage elements. Therefore, the plaintiffs' arguments on the localized problems are unsupportable.

## V. CONCLUSION

To support a jury's finding of causation, the plaintiff must prove both general and specific causation. In other words, a plaintiff must prove that the agent he or she alleges caused injury or illness 1) could do so in the general population, and 2) did so to him or her specifically. In this case, the plaintiffs' experts failed to offer any reliable evidence of general causation as defined by the Texas Supreme Court. In the absence of such evidence, the award of actual damages to the plaintiffs must therefore be reversed. Because we reverse the plaintiffs' actual damage awards, we must also reverse the punitive damage awards.

The judgment is reversed and rendered.

### ON MOTION FOR REHEARING

In their motion for rehearing, the plaintiffs contend that this Court disregarded the causation testimony of one of their experts, Pierre Blais, Ph.D. We have again reviewed the testimony of this witness and find that it relates primarily to alleged defects in the

silicone gel breast implants and not to causation. Although he was not designated to testify concerning causation, he was allowed, over vehement objection, to express some causation opinions. However, we find his testimony in this area unreliable under the *Robinson/Havner*[13] criteria. As an organic chemist, he is a biomaterials expert and was not otherwise shown to be qualified to render an opinion on medical causation. He admitted to having no qualifications in medicine. His causation opinions have not been scientifically tested. Although he characterized those opinions as "objective", he provided no objective criteria or measurement to support them. The record does not show that his opinions have been peer reviewed as contemplated under the *Robinson* criteria, and they have not been generally accepted by the scientific community. Most of his opinions were developed in the context of litigation. For these reasons, we find Blais' causation testimony not reliable under the criteria established by the Texas Supreme Court.

Plaintiffs' motion for rehearing is overruled.

**13.** *E.I.du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995); *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997).