DeMOSS, Circuit Judge,
dissenting:
I respectfully dissent. The plaintiffs in this case did not produce evidence that sufficiently demonstrates a causative link between their alleged injuries and Euclid’s short-nose coal haulers. The district court abused its discretion by lowering the Dau-bert standard for admitting expert opinion testimony which was neither relevant nor reliable. Finally, this case should have been dismissed as time-barred because the plaintiffs’ claims of injury, based on one doctor’s subjective evaluation of MRIs, are not objectively verifiable as required under Texas ease law governing the tolling of the statute of limitations pursuant to the discovery rule.
I.
Euclid, Inc., designs and manufactures 120-ton coal-hauling vehicles used at open pit coal mines. Before the mid-1970s, Euclid *278 used a “long-nose” design. Like a piek-up truck, this design put the engine at the front, with the cab above and behind. Then, responding to consumer demands for greater driver visibility and maneuverability, Euclid and its competitors switched to “short-nose” designs. The new designs placed the driver in front, with the engine below and behind. This gives the front of the vehicle a flat, snub-nosed appearance. Euclid’s design changes included other modifications, including a shorter wheel base, a trailing arm suspension, and rubber struts instead of steel springs.
When the short-nosed design was introduced in the mid-1970s, Euclid sold several vehicles to Texas Utilities Mining Company (TUMCO). The five original plaintiffs in this case, males ranging in age from 32 to 46, are former TUMCO employees. They all operated the Euclid 322 NDT short-nose coal hauler. In addition, the plaintiffs also operated other heavy machinery in the coal pit, including bulldozers, scrapers, water trucks, and end-dump trucks.
The plaintiffs allege that they have suffered back injuries which resulted from “repetitious trauma and severe vibrations” experienced while operating the Euclid short-nose coal hauler. They sued Euclid, claiming that their back conditions were due to the Euclid short-nose coal hauler’s defective design, which rendered the product unreasonably dangerous (the strict products liability claim), and Euclid’s negligent design, marketing, and failure to warn customers and operators about safety risks pertaining to the short-nose coal hauler (negligence and gross negligence claims). Their suit was filed in the Eastern District of Texas, Marshall Division.
The sufficiency and admissibility of the testimony offered by the plaintiffs’ expert witnesses lies at the heart of the controversy in this appeal. The plaintiffs’ five testifying experts have been divided by the panel majority into two categories — two engineer “liability” experts who testified about the shortnose coal hauler and three medical “causation” experts who testified about the plaintiffs’ injuries. Euclid sought summary judgment based on its contention that the plaintiffs’ proposed expert testimony, necessary to establish causation and liability, could not be admitted pursuant to Fed.R.Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Euclid’s Daubert argument was rejected by the district court, but a continuing objection to identified expert testimony was permitted. Euclid also raised a limitations defense, but the district court determined that the discovery rule would apply.
Ultimately, a jury rendered a $2.8 million verdict against Euclid. Euclid moved for judgment as a matter of law (JMOL) on the question of liability, all plaintiffs sought JMOL on Euclid’s contributory negligence arguments, and plaintiff Tim Rucker, who received a take-nothing judgment because of the jury’s determination that he was 70% contributorily negligent, moved for a new trial. These post-trial motions were denied. All parties timely appealed.
II.
A detailed discussion of the expert testimony offered at trial by the plaintiffs is necessary to the ensuing substantive discussions. As previously mentioned, the experts fall into two general categories- — engineers who testified about the design and quality of ride of the short-nose coal hauler (“liability experts”), and doctors who testified about the plaintiffs’ physical condition (“causation experts”).
A.
The liability experts testified about Euclid’s coal haulers. Mr. Geoff McDonald is an Australian engineer who had experience with the Euclid short-nose coal hauler dating back to 1977. Workers asked to operate a problematic Euclid short-nose coal hauler at the Blaekwater Mine in Australia refused to operate it because its ride was so rough.[1] *279 Mr. McDonald was asked to test the short-nose coal hauler at that time, and based on his testing in Australia, he testified that the long-nose haulers are safer because they are four to five times less likely to cause injury than the short-nose haulers.
Mr. Arthur Chaseling is a consulting mechanical engineer who also testified that he thought the long-nose design was safer. In 1996, Mr. Chaseling traveled with Mr. McDonald to Texas to test TUMCO’s short-nose coal haulers. Mr. McDonald testified that the mine operations and physical layout were similar to those at the Blaekwater mine. Messrs. Chaseling and McDonald together measured the vibrations experienced by TUMCO’s employees who operated the Euclid short-nose coal hauler. These tests were conducted by attaching an accelerometer to the metal frame below the seat of a Euclid coal hauler. Using these measurements, Mr. Chaseling determined that the Euclid short-nose coal hauler’s vibrations exceed the health and safety limits of the International Standards Organization (ISO).[2] Messrs. Chaseling and McDonald did not test any of the other earth-moving equipment operated at the mine to measure their vibrations, and they did not attempt any sort of comparison between the short-nose coal hauler and the other machines operated by the plaintiffs.
B.
The key causation expert was Dr. Charles N. Aprill, a medical doctor specializing in diagnostic radiology. He performed MRIs on the backs of approximately ninety TUM-CO employees, including the plaintiffs, who operated the Euclid short-nose coal hauler. These employees also operated other heavy machinery such as scrapers, bulldozers, water trucks, and end-dump trucks,[3] but Dr. Aprill’s tests did not indicate that he had considered the effect of, or differentiated among the TUMCO employees based on, their length of employment or the amount of time they spent operating particular machines. He compared the results of these MRIs with a “control group” of MRIs performed on a group of “consecutive patients who were scanned roughly during tlje time these [TUMCO] patients were scanned, who were referred because they had some sort of back problem.” The control group patients were selected to be age- and gender-matched to the test group of ninety TUMCO employees, but the control group did not include anyone who operated coal haulers or any other kind of earth-moving equipment.
Dr. Aprill found “endplate infractions’! — • impact craters which form in an interverte-bral disc when a load is applied to it — in 90% of the TUMCO employees and in 68% of the “control group” of other back pain patients being treated by Dr. Aprill. He also found that while the endplate infractions occurring in the general back-pain population clustered between the lower dorsal spine and the upper lumbar spine, the TUMCO employees exhibited endplate infractions in that area as well as throughout the lumbar spine. According to Dr. Aprill, these endplate infractions render one more susceptible to back injury. Dr. Aprill concluded that the “repeated vertical compression” experienced by the TUMCO employees caused the endplate infractions.
On cross-examination, Dr. Aprill opined that for “the normal population without any occupational stresses,”, the incidence of end-plate infractions is “something in. the order of *280 forty percent or so,” and that “any person that’s subjected to repetitive compression, whatever the source, is likely to develop changes similar to what we saw.” Dr. Aprill stated that he had not compared the MRIs of the backs of short-nose coal hauler operators to test results for the operators of any other type of coal hauler; neither had he compared the MRIs of short-nose coal hauler operators to those of workers who operated bulldozers, end-dump trucks, scrapers, water trucks, or tractors. He further stated that he could not testify about the effect of operating those kinds of heavy equipment because he had “not seen MRI scans on large numbers of other heavy equipment operators.” When challenged about his conclusions that the plaintiffs’ endplate infractions were caused by the vibrations of the Euclid short-nose coal hauler, Dr. Aprill conceded that he could not point to any study which might indicate how much vibration was necessary to produce the injuries he identified. His method and findings had not been reviewed by a statistician or an epidemiologist or submitted for peer review and publication, and no rate of error had been calculated for his theory. Furthermore, he had not conducted any prior research or studies — nor had he submitted any papers or published any articles — on vibration and its effects on the back.
Dr. Richard W. Bunch is a ergonomics consultant and physical therapist who rode in a Euclid short-nose coal hauler. Dr. Bunch used a pen and a pad of paper to keep track of the jerks and jolts that he felt during the ride. Based on his conclusions from this “semi-objective” field experiment, he testified that the vibrations experienced by the plaintiffs when they operated the Euclid short-nose coal hauler contributed to their injuries and that the design of the cab was not sufficient to protect the operator from the vibrations. Dr. Bunch’s test was not subjected to peer review.
Dr. Kelvin A. Samaratunga is a neurosurgeon and a clinician who evaluates and treats back pain. He reviewed all of the previously described expert testimony, and he rode on a Euclid short-nose coal hauler. In particular, he reviewed the plaintiffs’ medical records and MRIs. He testified that he agreed with Dr. Aprill that the endplate infractions were the result of whole body vibration, and that they would eventually lead to back problems for the plaintiffs. On cross-examination, Dr. Samaratunga conceded that he was not an expert on vibration and he had not per: formed any studies or published any materials in that field of study. He is not an epidemiologist or a statistician either. When asked, Dr. Samaratunga indicated that he could not identify any published study which indicated that the levels of vibration measured in the short-nose coal haulers could cause the injuries of which the plaintiffs complained. The materials reviewed by Dr. Sa-maratunga did not address the effect, if any, of the other equipment operated in the mines by the plaintiffs.
III.
Euclid unsuccessfully moved for judgment as a matter of law based on the insufficiency of the evidence to establish a causative link between the plaintiffs’ injuries and their operation of the Euclid short-nose coal hauler. De novo review applies, with inferences drawn in favor of the nonmoving party. See Gutierrez v. Excel Corp., 106 F.3d 683, 686 (5th Cir.1997).
A.
Texas law provides the substantive rule of what the plaintiffs were required to establish in order to prove Euclid’s liability. The landmark decision of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), established that “[ejxcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.” 304 U.S. at 78, 58 S.Ct. at 822. Generally speaking, federal courts sitting in diversity apply the substantive law of the state providing the law of decision, while following federal procedural law. See, e.g., Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 116 S.Ct. 2211, 2219, 135 L.Ed.2d 659 (1996). When the difference between applying state law and federal law is outcome-determinative, that factor is a strong indicator that the federal court should apply state law. See id. at 426-28, 116 S.Ct. at 2219-20; Guaranty *281 Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The test of outcome determination cannot, however, be applied mechanically; a federal court must instead be guided by “the twin aims of the Erie rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.” Gasperini 518 U.S. at 428, 116 S.Ct. at 2220 (quoting Hanna v. Plumer, 380 U.S. 460, 468, 85 S.Ct. 1136, 1142, 14 L.Ed.2d 8 (1965)).
Consistent with these principles, it is well established that in diversity cases, state law determines the quality and quantum of evidence that must be produced to establish a cause of action, while the standard for reviewing the sufficiency of evidence to sustain a jury verdict on appeal is indisputably governed by a federal standard. See, e.g., Jones v. Wal-Mart Stores, Inc., 870 F.2d 982, 986 (5th Cir.1989); Tutor v. Ranger Ins. Co., 804 F.2d 1395, 1398 (5th Cir.1986); Ayres v. Sears, Roebuck & Co., 789 F.2d 1173, 1175 (5th Cir.1986); McCandless v. Beech Aircraft Corp., 779 F.2d 220, 223 (5th Cir.1985); Fairley v. American Hoist & Derrick Co., 640 F.2d 679, 681 (5th Cir. Unit A 1981). Federal law thus mandates that we review the jury’s verdict by the same standard as the district court, affirming unless “there is no legally sufficient evidentiary basis for a reasonable jury to find” as the jury did. Fed. R.Civ.P. 50(a)(1); see Denton v. Morgan, 136 F.3d 1038, 1044 (5th Cir.1998). The Erie doctrine, however, mandates that the object of this inquiry be whether the evidence adduced by the plaintiffs adequately establishes a prima facie case according to the laws of the state of Texas, such that the jury verdict may be approved.
This result is necessary both to discourage forum-shopping and to ensure the equitable administration of the laws. Were we to apply some lower standard — essentially lowering the burden of proof — products liability and negligence plaintiffs would have a considerable incentive to file suit in federal court rather than in state court because it would be easier for them to win a case. That is precisely what the Erie doctrine seeks to prevent. In this case, we must therefore consider whether the plaintiffs have proved, as a matter of Texas law, that their injuries were caused by the Euclid short-nose coal hauler.
B.
Under Texas law, causation in fact is an element of the both the plaintiffs’ strict products liability claims and their negligence claims. See, e.g., Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775 (Tex.1995).[4] In order to establish this element, common to all their various claims that Euclid engaged in tortious activity, the plaintiffs must prove that vibrations produced by the short-nose coal hauler constituted “a substantial factor in bringing about the injury and without which no harm would have occurred.” E.g., Havner v. E-Z Mart Stores, Inc., 825 S.W.2d 456, 458-59 (Tex.1992) (emphasis supplied); Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 549 (Tex.1985) (emphasis supplied); see also Restatement (Third) of Torts: Products Liability § 15 (1997) (hereinafter Restatement (Third)) (“Whether a product defect caused harm to persons or property is determined by the prevailing rules and principles governing causation in tort.”). By requiring that the allegedly tortious activity be a factor “without which no harm would have occurred,” the test embodies, as one of its elements, the “traditional ‘but-for’ rule of causation.” 1 J. Hadley Edgar, Jr. & James B. Sales, Texas Torts and Remedies *282 § 1.05[2][a], at 1-111 (1998); see also W. Page Keeton et al., Prosser and Keeton on Torts § 41, at 266 (5th ed.1984) (hereinafter, Prosser & Keeton) (“Restricted to the question of causation alone, and regarded merely as a rule of exclusion, the ‘but-for’ rule serves to explain the greatest number of cases.... ”); David W. Robertson, The Common Sense of Cause in Fact, 75 Texas L.Rev. 1765, 1768 (1997) (noting that the but-for standard is the “most widely accepted test” for determining cause in fact); Restatement , (Third), supra, § 15. That being the case, Texas law requires that the plaintiffs prove but-for causation with respect to the alleged injurious effect of the short-nose coal hauler; it is not sufficient for the plaintiffs to merely present evidence that the vibrations produced by the short-nose coal hauler constituted a “substantial factor” in producing the plaintiffs’ injuries.[5]
C.
A five-step logical process provides a careful (if tedious) model for, determining whether a given event is a cause in fact of a plaintiffs injuries. In summary, the five logical steps for proving but-for causation are as follows:
(a) identify the injuries in suit; (b) identify the wrongful conduct; (c) mentally correct the wrongful conduct to the extent necessary to make it lawful, leaving everything else the same; (d) ask whether the injuries would still have occurred had the defendant been acting correctly in^that sense; and (e) answer the question.
Robertson, supra, at 1771. The application of this framework of analysis will help to locate any logical flaw which may taint the plaintiffs’ theory of causation.
The first step is to identify the plaintiffs’ injuries. In this case, the plaintiffs have alleged that they have suffered endplate infractions in their spines which render them more susceptible to serious back pain in the future. The second step is to name the defendant’s allegedly wrongful conduct. Because there are multiple answers at this second step relating to each of the plaintiffs’ theories of liability, we must consider each theory separately.
1.
The plaintiffs have a strict products liability claim and a negligence claim based on defective design. The allegedly wrongful conduct for the purposes of both of these claims was negligent design of the short-nose coal hauler pursuant to Euclid’s business decisions to stop manufacturing long-nose coal haulers and to begin manufacturing short-nose coal haulers. Because these separate claims focus on the same activity, they may be grouped for the purpose of determining whether that activity was a cause in fact of the plaintiffs’ injuries.
Taking the third analytical step with respect to these claims, we must hypothesize a scenario that would erase the effect of the allegedly wrongful conduct. According to the plaintiffs’ theory of their products liability case, the short-nose coal hauler subjects its operator to harmful vibration, rendering the machine defective and unreasonably dangerous.[6] Similarly, in the negligence rather *283 than strict liability context, the plaintiffs additionally contend that the Euclid acted negligently in designing the short-nose hauler, such that the machine’s operators were subjected to harmful vibrations, thus resulting in injury. In order to overcome the argument that the balance between “the utility of the product and the risk involved in its use” precludes liability on these theories, see, e.g., American Tobacco Co. v. Grinnell, 951 S.W.2d 420, 432 (Tex.1997), the plaintiffs pointed to the older long-nose coal hauler as a safer alternative design which, they contend, did not suffer from the same defect.
For the purpose of these design-based theories, then, the third step of the analysis would be accomplished by trading the short-nose coal haulers for Euclid’s older long-nose coal hauler models. The inquiry would then be completed by determining, at the fourth step, whether the plaintiffs’ injuries would have occurred if they drove long-nose coal haulers and not short-nose coal haulers. If not, taking the fifth and final logical step, cause in fact has been established.
2.
Regarding the plaintiffs’ remaining negligence and gross negligence claims, the allegedly wrongful conduct was a marketing defect, namely, Euclid’s failure to warn customers and operators about safety risks arising from vibration in the short-nose coal hauler. The plaintiffs contend that such warnings would have allowed them to minimize their exposure to vibration and repetitive trauma while operating the short-nose coal hauler.
Removing the effect of the wrongful conduct to take the third logical step in this scenario, one must hypothesize a work environment in which TUMCO and its employees were warned about safety risks arising from the short-nose coal hauler’s tendency to vibrate. One would therefore assume that precautions were taken to reduce or eliminate the exposure to vibration, either by TUMCO’s refusal to buy Euclid’s short-nose coal hauler, the plaintiffs’ refusal to operate the machine, or perhaps some sort of prophy-, lactic precaution such as a modification of the machine itself or of the employees’ usage of the machine. Given this scenario, the fourth step leads to the question of whether the plaintiffs would have been injured in a work environment exactly the same as it actually was except that they were not exposed to unsafe vibrations in the short-nose coal hauler. If it can be proved that there would have been no injury in this scenario, cause in fact will have been established for the plaintiffs’ negligence claim against Euclid.
3.
Based on the above reasoning, the key logical step in both scenarios is the fourth step designated above, specifically, “whether the injuries that the plaintiff[s] suffered would probably still have occurred had the defendant behaved correctly in the sense indicated.” Robertson, supra, at 1771. It is apparent that in order to establish Euclid’s liability on theories of strict products liability or negligence, the plaintiffs were required to present evidence to prove one of the two factual causation scenarios. They could show either that similarly situated workers who operated long-nose coal haulers but not short-nose coal haulers would not experience the injuries experienced by the plaintiffs (products liability and design defect claims), or that similarly situated workers who operated all the machines operated by the plaintiffs except the short-nose coal hauler would not experience the injuries experienced by the plaintiffs (marketing defect or failure-to-warn claims). I now turn to those absolutely necessary links of causation.
D.
Our guiding star in considering whether the plaintiffs have adequately established causation to justify imposing liability upon Euclid should be the recent treatment of tort causation by the Supreme Court of Texas in Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706 (Tex.1997) (hereinafter, Hamer).
In that case the court reversed a jury verdict in favor of plaintiffs who had claimed *284 that use of the drug Bendectin caused a birth defect in their child. The central issue throughout the litigation was the reliability of the expert testimony offered to establish causation. Though the specific issue before the court was whether the Havners’ evidence was scientifically reliable and constituted “some evidence” to support the plaintiffs’ judgment, the circumstances of the case led the court to consider precisely what a plaintiff must establish to raise a fact issue of whether a drug caused an individual’s birth defect. This prompted a discussion of some very fundamental issues relating to proving causation.
The court noted that causation in toxic tort cases can be discussed in terms of either general or specific causation:
General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual’s injury. In some cases, controlled scientific experiments can be carried out to determine if a substance is capable of causing a particular injury or condition, and there will be objective criteria by which it can be determined with reasonable certainty that a particular individual’s injury was caused by exposure to a given substance.
Havner, 953 S.W.2d at 714-15. In many toxic tort cases, however, direct experimentation cannot be done. As a result, there can be no reliable, direct evidence of specific causation. The court thus reasoned:
In the absence of direct, scientifically reliable proof of causation, claimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury. The finder of fact is asked to infer that because the risk is demonstrably greater in the general population due to exposure to the substance, the claimant’s injury was more likely than not caused by that substance. Such a theory concedes that science cannot tell us what caused a particular plaintiffs injury. It is based instead on a policy determination that when the incidence of a disease or injury is sufficiently elevated due to exposure to a substance, someone who was exposed to that substance and exhibits the disease or injury can raise a fact question on causation.
Id. at 715 (emphasis supplied) (citing Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1320 n. 13 (9th Cir.1995) (on remand from the Supreme Court)).
While Hamer dealt with causation principles in the context of a toxic tort case, the underlying issues are compellingly similar to the problems of proving that the Euclid short-nose coal hauler caused the plaintiffs’ injuries in this case. First, the plaintiffs in Hamer, just like the plaintiffs in the instant case, brought a products liability suit based on theories of negligence, defective design, and defective marketing. Second, the Hav-ners did not contend that all limb reduction birth defects are caused by Bendectin, and, likewise, the plaintiffs before us in this appeal recognize that not all endplate infractions are caused by driving Euclid’s short-nose coal hauler. Finally, in Havner, as here, the only proof of causation offered by the plaintiffs was scientific expert testimony relating the results of studies on the association between the use of a product and certain injuries which allegedly resulted from that use.
The plaintiffs and the panel majority would prefer that this case be treated differently than Hamer, asserting that the present litigation is nothing like the infamous Bendectin cases. Quite to the contrary, this case bears many similarities to that significant, trendsetting series of cases. An underlying premise in many toxic tort cases is that the plaintiff has suffered an injury, such as cancer, which may have occurred even if the plaintiff had not been exposed to the substance at issue. So too in this case, the plaintiffs claim that they have suffered an injury, endplate infractions, which may have occurred even if they had never operated the short-nose hauler. Furthermore, and very significantly, just as toxic tort causation (as a practical matter) usually cannot be established by exposing human subjects to the substance in question for testing purposes, direct experimentation cannot be done (or at least has not been done) to prove objectively that use of the short-nose coal hauler causes endplate infrac *285 tions, and these plaintiffs are therefore left to attempt to prove their case using epidemiological (or, in this case, pseudo-epidemiological) studies. In these respects, the case sub judice is much more akin to a toxic tort case than a traditional personal injury case, and as such, we should not shy away from considering Texas law regarding toxic torts.
Because causation cannot be proved directly by the plaintiffs, the only remaining avenue available in tort law for the purpose of proving causation is to demonstrate that their use of the short-nose coal hauler increased their risk of injury. In order to determine causation in these circumstances, the finder of fact must be guided by the “more likely than not” burden of proof.
Havner established as a matter of Texas law that the more likely than not burden of proof requires, in order to be probative of causation, that epidemiological studies must demonstrate more than a doubling of the risk of injury.[7] The supreme court explained:
Although we recognize that there is not a precise fit between science and legal burdens of proof, we are persuaded that properly designed and executed epidemiological studies may be part of the evidence supporting causation in a toxic tort ease and that there is a rational basis for relating the requirement that there be more than a “doubling of the risk” ... to the more likely than not burden of proof.
Havner, 953 S.W.2d at 717. This same standard of causation applies to the scientific evidence adduced by the plaintiffs in this case. Even though the studies conducted by the plaintiffs’ experts are not “epidemiological studies,” the plaintiffs’ studies seek to accomplish the same objective as an epidemiological study — they attempt to explain the cause of the endplate infractions which their MRI studies show that the plaintiffs experienced. Indeed, the only reason why the plaintiffs’ experts’ studies are not epidemiological studies is because they were not conducted according to well-established standards for reliably conducting epidemiological inquiries.
A scientific study providing indirect scientific evidence of tort causation, standing alone, is not sufficiently probative of legal causation if it does not tend to show that the suspected cause is more likely than not the actual cause of an injury. In other words, such a study is not probative of causation if it fails to demonstrate that the suspected cause doubles the risk of injury as compared to the general population which was not exposed or subjected to the suspected cause.
E.
Assuming, arguendo, the admissibility of the plaintiffs’ experts’ testimony,[8] the evidence of causation is insufficient to support a verdict of negligence or strict liability. The key flaw in the plaintiffs’ evidence is that it fails to show that the plaintiffs’ common injuries and exposure to the Euclid short-nose coal hauler are anything more than a coincidence.
Dr. Aprill’s “study” revealed endplate infractions in 90% of the TUMCO employees and 68% of the “control group” of back pain patients. Based on this statistical comparison, it is apparent that any given back-pain patient most likely would have had the infractions even though he had not operated a Euclid short-nose hauler.[9] Likewise, it is *286 apparent that the risk of endplate infractions in the TUMCO employee test group is not more than twice the risk of endplate infractions in the control group. Plainly then, the statistics produced by the study do not tend to establish the plaintiffs’ case. Cf. Havner, 953 S.W.2d at 717.
Moving beyond the statistical findings, however, the majority primarily rests its conclusions upon the so-called “fingerprint” of injury characteristics exposed by Dr. Aprill’s subjective interpretation of the number and physical distribution throughout the spine of endplate infractions as exhibited in the plaintiffs’ MRIs. Unfortunately, this “fingerprint” evidence is completely irrelevant because it bears absolutely no relation whatsoever to the links of causation that the plaintiffs are obligated to demonstrate. The “fingerprints” give us no guidance as to whether the injuries would have occurred if the plaintiffs had operated long-nose coal haulers rather than short-nose coal haulers. Neither do the “fingerprints” demonstrate that the injuries would not have occurred absent exposure to the short-nose coal hauler. There is no proof that the level of vibration produced by the short-nose coal hauler was in any respect significantly different from the level of vibration generated by other heavy earth-moving equipment operated by the plaintiffs.[10] In fact, Dr. Aprill conceded that he could not distinguish, based on his study, which of the many pieces of heavy machinery operated by the coal haulers might have been the cause of the endplate infractions. That is so, at least in part, because the study made no attempt to differentiate among its. subjects .based on their work histories, including what types of equipment the TUMCO employees had operated, and for what periods of time they operated that equipment. Dr. Aprill had no way to eliminate from his study the effects of other sources of vibration.
As explained earlier, see supra Part III(B), one of the above mentioned factual scenarios had to be established as a factual predicate to the plaintiffs’ recovery.[11] Without a tie to *287 the particular injuries experienced by the plaintiffs, the opinions of Dr. Bunch and Dr. Samaratunga shift on their foundations. In essence, these two witnesses confirmed that the Euclid short-nose coal hauler vibrates, that vibrations can cause back injury, and that the plaintiffs who operated the short-nose coal hauler have indeed suffered back injury. They relied on Dr. AprilTs analysis to connect their knowledge about the machine and theories about whole body vibration to the plaintiffs’ flesh and blood. Their testimony does not repair the fatal flaw in Dr. Aprill’s testimony.
The liability experts’ opinions that the Euclid short-nose hauler may subject its operators to injury due to prolonged exposure to harmful vibrations suffer from the same variety of logical flaw — they are not linked to the specific injury claimed by the plaintiffs. Messrs. Chaseling and McDonald started with their measurements of the vibrations produced by the short-nose coal hauler. They then compared these findings to recommendations by the ISO concerning what amount of vibration may be acceptable. Having determined that the short-nose coal hauler’s level of vibration is unacceptable according to ISO standards, these experts then reasonably opined that exposure to too much vibration can be harmful. All of this information is pertinent to the plaintiffs’ claims, but none of it provides the answer to the ultimate question. None of it links the particularized information about the vibrations , experienced by the plaintiffs in this case to the types of injuries experienced by the plaintiffs in this case. None of it eliminates other possible sources of vibration as the cause of the plaintiffs’ injuries. Their testimony therefore does not permit the inference that the specific injuries claimed by the plaintiffs were caused by the Euclid short-nose coal hauler.
Simply put, nothing in the evidence presented by Dr. Aprill or any of the plaintiffs’ other experts suggests the required but-for link between the short-nose hauler’s vibrations and the incidence of endplate infractions in the plaintiffs’ backs. Explained yet another way, even if Dr. Aprill’s study demonstrates that the endplate infractions observed in the plaintiffs’ backs are more likely than not attributable to some aspect of their occupation (which, as a matter of logic, is all that his studies could possibly demonstrate), the study does not link the Euclid short-nose hauler to the increased incidence of endplate infractions. The study does not distinguish the effects of the Euclid short-nose coal hauler from the effects of any other kind of equipment operated by the plaintiffs. Moreover, a mere “blend” of expert opinions depicting a blurry relation resembling a causative link between Euclid’s product and the plaintiffs’ injuries is insufficient to support the verdict.[12] “Proof of causation cannot turn upon speculation or conjecture.” Leitch v. Hornsby, 935 S.W.2d 114, 119 (Tex.1996) (internal quotation marks omitted).
The plaintiffs showed that they and their coworkers operated the Euclid short-nose coal hauler. The plaintiffs demonstrated that the Euclid short-nose coal haulers vibrate, and that may be a bad thing. Finally, the plaintiffs explained that, in the opinion of Dr. Aprill, they and their coworkers have endplate infractions which appear in their spines in a unique fashion. But the plaintiffs did not establish the crucial logical link — that it was the act of operating the short-nose coal haulers that caused their endplate infractions. That logical lapse should be fatal to their case. Because the plaintiffs have not presented evidence that establishes that operating Euclid short-nose coal haulers was a cause in fact of the plaintiffs’ endplate infractions, Euclid should have been granted JMOL.[13]
*288 IV.
Euclid unsuccessfully sought to suppress the testimony of the plaintiffs’ expert witnesses by challenging their qualifications to present expert opinion. Euclid now challenges on appeal the admission of plaintiffs’ experts’ testimony. This Court reviews for abuse of discretion. See General Elec. v. Joiner, — U.S. -, -, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997); Moore v. Ashland Chem. Inc., 151 F.3d 269, 274 (5th Cir.1998) (en banc).
The Federal Rules of Evidence provide:
Rule 702. Testimony by Experts
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The Supreme Court’s decision in Daubert guides the application of Rule 702. As our Court recently summarized:
[W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert’s opinion is reliable and relevant to the facts at issue in the case. See Daubert, 509 U.S. at 589, 113 S.Ct. at 2794-95. Daubert went on to make “general observations” intended to guide a district court’s evaluation of scientific evidence. The nonexclusive list includes “whether [a theory or technique] can be (and has been) tested,” whether it “has been subjected to peer review and publication,” the “known or potential rate of error,” and the “existence and maintenance of standards controlling the technique’s operation,” as well as “general acceptance.” 509 U.S. at 593-594, 113 S.Ct. at 2796-97.
Watkins v. Telsmith, Inc., 121 F.3d 984, 988-89 (5th Cir.1997).
A.
The plaintiffs’ experts’ opinions that the Euclid short-nose coal hauler caused the plaintiffs’ back injuries were inadmissible primarily because the substance of those opinions was not relevant as a matter of law. Rule 702 permits expert opinion testimony only in circumstances in which the opinion “will assist the trier of fact to understand the evidence or to determine a fact in issue.” For all of the reasons stated in Part III of this dissent, which explained that the evidence was not sufficient to prove causation, the evidence was furthermore inadmissible under Rule 702 for the same reason. Because the substance of the expert opinion testimony did not tend to prove causation, it was inadmissible as a matter of law because it could not assist the jury. As the Supreme Court explained:
Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796 (footnotes omitted, emphasis supplied); see also Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1321 n. 17, 1320-22 (9th Cir.1995) (“Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury.”); Kenneth R. Foster & Peter W. Huber, Judging Science: Scientific Knowledge and the Federal Courts 34-36 (1997); cf. Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 311-15 (5th Cir.1989).
Without belaboring the point, it should be sufficient to note the well-established requirement, grounded in Rule 702, that there be a “fit” between the opinions offered by an expert and some material issue in the case. If, as in this case, an expert’s opinion is based on reasoning which as a matter of law is insufficient to support the expert’s conclusion, that opinion should not be admitted into evidence because, as a matter of law, it cannot be helpful to the trier of fact and is therefore inadmissible.
*289 B.
The plaintiffs’ causation experts’ testimony that the Euclid short-nose coal hauler caused the plaintiffs’ back injuries was also inadmissible because it was not scientifically reliable. In deciding Euclid’s Daubert challenge, the district court acknowledged the factors provided by the Supreme Court, and then went on to list factors which it found compelling in this case: the witnesses’ credentials; “a body of literature dealing with repetitive trauma back injuries”; the fact that the theories could be tested; and the fact that the “theories are derived from methodology which relates to other accepted methodologies.”[14] These factors do not adequately ensure the reliability of the experts’ opinions.
Though the Supreme Court expressly noted that Daubert’s list of factors is nonexclusive, it is certainly significant that the testimony of Dr. Aprill is plainly inadmissible under those original Daubert standards. The district court found that Dr. Aprill’s hypothesis could be tested, but none of the other indicia of reliability are present. The theory has not, in fact, been tested. It has not been subjected to peer review or publication. No known or potential rate of error has been provided. There are no standards controlling the technique’s operation. There is no suggestion that Dr. Aprill’s method is generally accepted.
There is a good reason why almost none of the original Daubert criteria are satisfied by Dr. Aprill’s methodology. It is that there is an entire field of study devoted to the task which he attempted. “Epidemiology is'the field of public health that studies the incidence, distribution, and etiology of disease in human populations and applies the findings to alleviate health problems.” Linda A. Bailey et al., Reference Guide on Epidemiology, in Reference Manual on Scientific Evidence 123, 125 (Federal Judicial Center 1994) (emphasis in original). Dr. Aprill did not use epidemiological methodology to come to his conclusions; he generated a study for the purposes of this litigation and offered an opinion about what it shows. This is precisely the sort of ad hoc method of creating testimony that Rule 702 and Daubert exclude.
The factors relied upon by the district court essentially lower the Daubert bar. The court cited the witnesses’ credentials, but plainly credentials are not enough. The court cited the presence of “a body of literature” dealing with the type of injuries claimed by the plaintiffs, but that factor completely swallows Daubert’s inquiry into peer review and publication. As Euclid points out, by that reasoning expert testimony about space alien abductions would also be admissible. Likewise, the district court’s reference to the fact that the plaintiffs’ experts’ “theories are derived from methodology which relates to other accepted methodologies” simply lowers the standard set by Dau-bert’s reliance upon “general acceptance.”
In sum, the factors cited by the district court in support of admitting the testimony of the plaintiffs’ experts seriously weaken the standards of Rule 702 and Daubert. It was, therefore, an abuse of discretion to consider these factors and admit the testimony.
V.
With respect to all of the original plaintiffs except Mr. Johnny Bartley (who has since settled his claims against Euclid), the claims are barred by limitations unless the discovery rule applies. The jury found that the plaintiffs’ injuries were inherently undiscov-erable and objectively verifiable. These are the two prerequisites to applying the discovery rule under Texas law. See, e.g., Childs v. Haussecker, 974 S.W.2d 31, 36 (Tex.1998); Computer Assocs. Int’l, Inc. v. Altai, Inc., 918 S.W.2d 453, 456 (Tex.1994).
In this case, it is very plain that the plaintiffs’ injuries are not what the Supreme Court of Texas considers to be “objectively verifiable.” “Expert testimony ... d[oes] not supply the objective verification of wrong and injury necessary for application of the discovery rule.” S.V. v. R.V., 933 S.W.2d 1, 7 (Tex.1996). Objective verification is a “high *290 er level of certainty” than the mere preponderance of evidence required to find liability. Cf. id. at 19. For example, a sponge left inside a person by a surgeon is objectively verifiable. See Gaddis v. Smith, 417 S.W.2d 577 (Tex.1967). In the context of a charge of sexual abuse that was “discovered” after the alleged victim recovered repressed childhood memories, the Supreme Court listed the kinds of evidence that would qualify as objectively verifiable:
The kinds of evidence that would suffice would be a confession by the abuser, e.g. Meiers-Post v. Schafer, 170 Mich.App. 174, 427 N.W.2d 606, 610 (1988); a criminal conviction, e.g. Petersen v. Bruen, 106 Nev. 271, 792 P.2d 18, 24-25 (1990); contemporaneous records or written statements of the abuser such as diaries or letters; medical records of the person abused showing contemporaneous physical injury resulting from the abuse; photographs or recordings of the abuse; an objective eyewitness’s account; and the like. Such evidence would provide sufficient objective verification of abuse, even if it occurred years before suit was brought, to warrant application of the discovery rule.
S.V., 933 S.W.2d at 15.
Here, as in Robinson v. Weaver, 550 S.W.2d 18 (Tex.1977), “[e]ven the fact of injury is a matter of expert testimony.” Robinson, 550 S.W.2d at 21 (quoted with approval in S.V., 933 S.W.2d at 7). There was dispute among the experts at trial as to whether there is even such a thing as an “endplate infraction.” The following dialogue occurred when Euclid cross-examined Dr. Aprill at trial about his interpretations of the plaintiffs’ MRI scans:
Q Now, sir, isn’t it true that the vast majority of the articles that either you’ve written alone or with other people, that the vast majority of these articles have two radiologists, or at least two radiologists, to look over the same scans that are the subject of those articles in order to see if the radiologists agree with the interpretations?
A No, that is not true.
Q Well, sir, do you think that there’s a problem or that there’s something wrong about having work checked over to see if your interpretation of an MRI is the same as somebody else’s?
A No, I don’t.
Q Have you had a radiologist, other than yourself, look over your interpretations of these MRIs in order to see if they agree with what you said?
A No, I have not.
Q But radiologists other than you have reviewed these MRIs, have they not, sir?
A I don’t know.
Q Have you not seen the reports done by Dr. Gallman, the chief of radiology at Schumpert Hospital, concerning your interpretation of these MRIs?
A I saw his review of the interpretation of five of the MRIs. There are 165 scans done, and I think he commented on five.
Q We are talking about the five Plaintiffs in this ease, he commented upon those, did he not?
A Yes. Yes, he did.
Q And he disagreed with many of the things you said, did he not sir?
A Yes, he did.
Q And he disagreed with the importance that you placed on some of the things that you found, did he not, sir?
A Yes, he did.
Q And he disagreed with your opinions in this case, did he not?
A Yes, he did.
Q Would you agree with me, sir, that different radiologists have different styles interpreting MRIs?
A Yes, they do.
Q I want to show you a statement out of the “New England Journal of Medicine” ... and ask if you agree with this_ “This new study is also a reminder that the interpretation of MRI findings can vary substantially so that the results may be equivocal despite the techniques or of infallibility. Thus, for example, Jensen, et al found that one expert neuroradiologist was 30 percent more likely to interpret a study as showing a disc protrusion than a second expert neuroradiologist reading the same films. This variation, although no worse *291 than that for many other complex, clinical tests requiring expert interpretation, creates further opportunities for erroneous clinical decisions.” Would you agree with that?
A Yes.
Q Some radiologists think certain things are abnormal and some don’t, is that fair to say?
A Yes. Yes.
Q And there are a number of things that you claim are abnormal on the MRIs of these Plaintiffs here which other doctors do not think are abnormal; isn’t that right, sir?
A I don’t know that for a fact. The only person that I know that has commented on them is the doctor that you mentioned.
The point was illuminated when Euelid presented its case. A hospital’s chief radiologist presented as an expert witness, Dr. William H. Gallman, III, had reviewed the plaintiffs’ MRIs. He testified that there was absolutely nothing unique or abnormal about them. He further commented that although his practice involved daily reviews and interpretations of MRIs, he had never seen or heard the term “endplate infraction,” none of his colleagues had seen or heard it, and he believed that Dr. Aprill had fabricated the concept for the purpose of this litigation. The phenomenon referred to by Dr. Aprill as an endplate infraction is, in the opinion of Dr. Gallman, “extremely common,” having “no significance” and seen “every day on multiple studies of different patients of all walks of life.” Another of Euclid’s experts, Dr. Malcolm Pope, distinguished professor in the Departments of Biomedical Engineering, Orthopedic Surgery, Preventative Medicine, and Mechanical Engineering at the University of Iowa, testified that endplate infractions are “not a widely accepted abnormality” and that “[sjome radiologists would not even report it.”
Where even the fact of injury is disputed, and contested expert testimony provides the only explanation for the cause of that injury, it is impossible to conclude that the injury is “objectively-verifiable.” The discovery rule is an exception to Texas statutes which otherwise limit the period of time in which plaintiffs may seek redress for injuries. The Supreme Court of Texas has made it clear that the discovery rule is not justified in cases where the injury cannot be demonstrated by clear physical evidence. The plaintiffs’ claims in this case are time-barred because they do not meet that high prerequisite to the application of the discovery rule.
VI.
For the foregoing reasons, the judgment of the district court should be reversed and judgment should be rendered in favor of Euelid. Accordingly, I dissent from the panel majority’s contrary conclusion.

. The ISO standards are not binding on Euclid, and Euclid contests the probity of using these standards.

. Plaintiff Johnny W. Bartley testified:
[T]here were several jobs that a hauler operator would perform in hauler operator classification, of course, one being operate the hauler, another being to run the crusher, run the water truck and assorted pump duties, the dewa-tering type job whereupon rains you would pump water out of the pit to help dry it up. You were kind of a do-all individual.
All the other plaintiffs except Mike R. Rucker testified that they operated the same machines described by Mr. Bartley, as well as a bulldozer. Mr. Rucker had only begun driving the coal hauler for TUMCO in late 1990 or early 1991, and he testified that in addition to the coal haulier he also operated the water truck, end-dump truck, and a backhoe. During previous employment, Mr. Rucker had been a manual laborer, had operated other heavy machinery, such as a forklift, and had injured his back on the job.

. As the Texas Supreme Court neatly summarized:
Negligence requires a showing of proximate cause, while producing cause is the test in strict liability. Proximate and producing cause differ in that foreseeability is an element of proximate cause, but not of producing cause. Proximate cause consists of both cause in fact and foreseeability. Cause in fact means that the defendant’s act or omission was a substantial factor in bringing about the injury which would not otherwise have occurred. A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." Common to both proximate and producing cause is causation in fact, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the plaintiff's injuries.
Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775 (Tex.1995) (emphasis supplied, citations omitted).

. Strictly speaking, the "substantial factor” inquiry is probative only in the event that "two causes concur to bring about an event, and either one of them operating alone, would have been sufficient to cause the identical result.” Prosser & Keeton, supra, § 41, at 266. The plaintiffs have not argued that the Euclid short-nose coal hauler is one of several factors which would have independently caused their injuries, so we need not consider whether these facts fall into that special subset of cases.

. "In Texas, section 402A of the Restatement (Second) of Torts governs claims for strict liability in tort.” American Tobacco Co. v. Grinnell, 951 S.W.2d 420, 426 (Tex.1997) (citing Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 613 (Tex.1996); McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, 788-89 (Tex.1967)). According to that rule:
(1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
Restatement (Second) of Torts % 402A (1965). "A product may be unreasonably dangerous because *283 of a defect in marketing, design, or manufacturing.” Grinnell, 951 S.W.2d at 426.

. Of course, Havner does not puiport to require that, and we need not consider whether, epidemiological standards must be used be used to’ indirectly prove tort causation with scientific medical opinion testimony. It is certainly worthy of note, however, that this Court has previously stated: "While we do not hold that epide-miologic proof is a necessary element in all toxic tort cases, it is certainly a very important element.” Brock v. Merrell Dow Pharms., Inc., 874 F.2d 307, 313 (5th Cir.1989).

. For reasons explained later, the expert opinions were not admissible. See infra Part IV.

.The panel majority refers to Minnesota Mining & Manufacturing Co. v. Atterbury, No. 06-97-00099-CV (Tex.App. — Texarkana July 31, 1998, n.p.h.) (not designated for publication), 1998 WL 436916 (hereinafter, 3M), for the propositions that there is "no requirement that a party must have reliable epidemiological evidence of a relative risk of 2.0 or greater” and that “[rjeliable evidence of relative risk less than 2.0 can be considered, but must be supported by other credible, reliable evidence of causation.” Majority Op. at Part IV(c) (citing 3M, 1998 WL 436916, at *15). It is certainly true that the court in Havner did not impose a requirement that epidemiological evidence be used to prove causation, *286 but that does not mean that epidemiological evidence that does not show a doubling of the risk may be used or that such evidence will support a jury's verdict.
The 3M Court relied on Pick v. American Medical Sys., Inc., 958 F.Supp. 1151 (E.D.La.1997), for the proposition that "epidemiological evidence with a relative risk lower than 2.0 should he considered because ... it is relevant evidence.” 3M, 978 S.W.2d at 197, 1998 WL 436916, at " 15. Several things should be noted about the Pick opinion. First, Pick is the opinion of a federal district court in Louisiana, applying Louisiana law to a products liability and negligence case arising from a claim that Mr. Pick’s penile implant, designed and manufactured by the defendant, caused Mr. Pick to suffer from various health disorders which led to his eventual death. Our task in deciding diversity cases is to apply state law in the same fashion as we can best discern that the state supreme court would apply it. Although in deciding 3M the Texarkana Court of Appeals relied on a decision of the United States District Court for the Eastern District of Louisiana, Pick, to inform its interpretation of an opinion of the Supreme Court of Texas, Havner, I am not persuaded that the Supreme Court of Texas would follow the same path. Second, Pick refers only to the admissibility of epidemiological evidence of relative risk above 1.0, not whether such evidence will support a jury verdict imposing liability. See Pick, 958 F.Supp. at 1160. In fact, the court in Pick granted summary judgment for the defendant based on the inadequacy of the plaintiffs’ evidence to prove causation, and the plaintiffs’ evidence in that case was not limited to epidemiological evidence. See id. at 1173.

. Experts for Euclid, on the other hand, did test the other machines and found that, assuming that the vibration of these machines was a concern at all, other machines such as the bulldozer and the scraper presented a much greater concern for the operators than did the short-nose coal hauler. For the apparent purpose of demonstrating to the jury that the vibrations were not a serious concern, Euclid’s experts also compared the short-nose coal hauler’s vibrations to those generated by a Corvette and a Suburban driven around the courthouse square.

. An alternative, more formal logical explanation for the problem presented by this case may be that Dr. Aprill’s reasoning suffers from the "fallacy of post-hoc statistics,” which occurs when "[differences that are discovered by accident then become the verification of an ad-hoc hypothesis that was the result of the observation.” Kenneth R. Foster & Peter W. Huber, Judging Science: Scientific Knowledge and the Federal Courts 143 (1997) (quoting Petr Skraba-nek & James McCormick, Follies and Fallacies in Medicine (1990)). Dr. Aprill conducted his tests in 1995; Messrs. Chaseling and McDonald were summoned to Texas in 1996. It appears that the vibration theory was developed to support Dr. Aprill’s analysis of the MRIs. "This is fallacious because it confuses pre- and post-test probabilities.” Id. (quoting Skrabanek & McCormick, supra).

. This is a fair characterization of the testimony given by Dr. Samaratunga, who essentially provided an "expert” summarization of previously admitted expert testimony, apparently for the purpose of bridging the gaps and creating an illusion of logical cohesion.

. The panel majority is absolutely correct in its statement of law that if an “act actively aids in producing an injury, it need not be the sole cause, but it might be a concurring cause, and such as might reasonably be contemplated as contributing to the result.” Majority Op. at Part IV(c) (citing McClure v. Allied Stores, Inc., 608 S.W.2d 901, 904 (Tex.1980)). The fact that there may be multiple causes in fact for any given injury does not, however, eradicate the requirement of proving but-for causation in this case.

. These supplemental factors were derived from United States v. Downing, 753 F.2d 1224 (3d Cir.1985), a pre-Daubert decision.